412 So.2d 867 (1982)
STATE of Florida, Appellant,
v.
Barnabe I. PERERA, Alegandro Barreiro, Jose B. Rojas, Juan Borrego, Luis A. Garcia, Arthuro P. Guarez, Luis R. Ortiz, Nilo A. Hernandez, Miguel Peralta, Armando Quiroz, Jose O. Villanueva, Hipolito L. Visona, Armando A. Gonzalez, Appellees.
No. 81-1498.
District Court of Appeal of Florida, Second District.
March 3, 1982.
Rehearing Denied April 16, 1982.
*868 Jim Smith, Atty. Gen., Tallahassee, and Michael A. Palecki and James S. Purdy, Asst. Attys. Gen., Tampa, for appellant.
Raymond E. LaPorte, and William B. Plowman, Tampa, for appellees.
GRIMES, Judge.
The state seeks reversal of an order granting appellees' motion to suppress physical evidence. The question which the case presents is whether the stop of three vehicles allegedly involved in a marijuana smuggling operation and the arrests which resulted from that stop were legal.
The state filed an information which charged all appellees with trafficking in cannabis in excess of ten thousand pounds and possession of cannabis in excess of one hundred pounds with intent to deliver. In addition, it charged appellees Perera and Rojas with illegally possessing various weapons. Appellees filed a pretrial motion to suppress the marijuana and the weapons.
The Hillsborough County Sheriff's Department had received a tip from a confidential informant to be on the lookout for three vehicles carrying a shipment of marijuana on U.S. Highway 41 during the early morning hours of January 9, 1981. Hence, a number of county deputies and agents of the Florida Department of Law Enforcement were on hand when the three vehicles were spotted near Ruskin. Apparently because the state wished to protect the identity of the confidential informant, the court limited the evidence at the hearing to events which transpired while the vehicles were on Highway 41. The state made no effort pursuant to the principles of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), to establish probable cause through the veracity of the informer's tip. Therefore, while the motivations of the several law enforcement officers may have been influenced by what they had heard from the confidential informant, the propriety of their actions was tested at the motion to suppress by only what they observed on the highway that night.
Sergeant Robert DeLuna testified that at approximately 3:00 a.m., he saw a large tractor-trailer, a van and a car travelling in a southerly direction on Highway 41 on the north edge of Ruskin. The traffic was light with only one or two other vehicles about. DeLuna was monitoring two citizens band radios in his car. As he observed the three vehicles, he overheard a clear C.B. transmission in Spanish, a language that he understood, which stated, "You are apparently so loaded down with marijuana; you are going so slow. If we need to, we will have to get out and push you."
Sergeant DeLuna further testified that it looked to him as if the three vehicles were travelling together in the same lane in a caravan-type procedure which he had known smugglers to use to protect their load. The Ruskin area had a speed limit of thirty-five miles an hour, but the vehicles were travelling only twenty to twenty-five miles an hour. DeLuna observed C.B. antennas on the van and the tractor-trailer. He advised his men in other cars along the highway of what he had heard and seen and told them to keep the vehicles under surveillance. Even after the vehicles left Ruskin, they continued to travel together at the same slow rate of speed. Thereafter, as DeLuna was kept apprised of the progress of the vehicles, he testified that he heard someone on a police frequency say that what appeared to be residue had been observed on the rail deck lid of the tractor-trailer. He was also informed that Latin males were in the car. He knew that side roads into the area through which the three vehicles were travelling led from sites which were frequently used for off-loading *869 and other smuggling activities because of their isolated nature. DeLuna finally ordered the vehicles to be stopped but said he did not order anything else to be done at this point. The vehicles were stopped by the law enforcement officers in a lonely area about four miles south of Ruskin.
Several other officers made similar observations with respect to the three vehicles. Detective Tipton said he could tell that they were travelling in a caravan because as they approached a traffic light in Ruskin which was about to change, the lead vehicle slowed down in order to catch the red light rather than pass through and leave the trailing vehicles stopped at the light. Tipton observed two of the occupants of the automobile through binoculars and determined that they were Latin males. He confirmed the fact that he passed this information on to DeLuna. Tipton said he also heard a radio communication prior to the time the stop was made which stated that marijuana residue was on the rear bed of the tractor-trailer. However, none of the officers at the hearing said that they had actually seen marijuana residue on the back of the tractor-trailer until after it was stopped, and each of them denied having been the originator of this communication. Some of the officers said that when they stopped the vehicles, they intended to arrest the occupants.
After the vehicles were stopped, the officers approached them with guns drawn. In each case, the officers discovered incriminating evidence before effecting a formal arrest. Detective Tipton could see marijuana residue on the clothing of all of the occupants of the car and noted that the clothing of the two men in the rear seat was wet from the knees down. He also saw the butt of a weapon on the floor. Detective Luis was first to approach the van, and he asked the driver to step out and show him some identification. When the man opened the van door, Luis could smell a strong odor of marijuana. He then discovered eight occupants of the van who had pieces of marijuana on their clothing. Sergeant John Whelchel said he saw marijuana on the back ledge of the tractor-trailer as he approached it on foot. He could also smell a strong odor of marijuana surrounding the vehicle.
The pertinent portion of the order of suppression read as follows:
1. That the Defendants' Motion to Suppress Evidence is hereby GRANTED.
2. That the Defendants were illegally stopped and illegally arrested.
3. That all evidence seized from the Defendants and from the three vehicles was seized without a lawful arrest, a valid Search Warrant or other lawful authority.
4. That the actions of the Police authorities constituted an illegal arrest, not merely a temporary stop and detention. The actions of the Police authorities, from the moment the stop order was given by Sgt. De Luna, is [sic] indistinguishable from a traditional arrest. The testimony of the witnesses corroborates this conclusion. The three vehicles were forcibly stopped by numerous Police vehicles, both marked and unmarked. The stop was effected by the use of sirens and flashing blue and red lights. The Defendants were ordered from their vehicles at gunpoint. Numerous officers approached the Defendants' vehicles with shotguns, rifles, automatic weapons, and revolvers in full view and ready for use. Many of the Defendants were immediately placed face down beside the road with their hands handcuffed behind their back. Further, the officers at all times demonstrated an intention to arrest the Defendants from the moment the order to stop was given. The Defendants were never free to leave the scene and had they attempted to do so they would have been physically restrained. The State's contention that the stop of the vehicles was a temporary detention is specifically rejected.
5. That the illegal arrest was not based on a valid arrest warrant or probable cause. The fact that three vehicles were proceeding South on U.S. Highway 41 through the downtown area of Ruskin, Florida in close proximity to each other *870 and further that the vehicles slowed their speed as they approached a traffic light at U.S. 41 and State Road 674 and further, that upon leaving the stop light the vehicles remained relatively close to each other and proceeded below the speed limit does not constitute probable cause to arrest the occupants of the vehicles or justify the actions of the Police authorities in this case. Further, the testimony regarding the CB radio transmission allegedly overheard by Sgt. De Luna cannot be attributed to these vehicles and to conclude otherwise would be to engage in speculation and guesswork and is therefore rejected. Also, the proported [sic] sighting of marijuana residue, prior to the stop, on the back ledge of the tractor trailer truck has not been established by the evidence and is accordingly rejected by this Court. Those witnesses that observed the alleged residue testified that they observed it after the tractor trailer was stopped by the Police authorities. Further, the testimony that a couple of the occupants of the vehicle were of a Latin appearance is not unusual in the Tampa area and therefore has no consequence.
6. That even assuming arguendo that the stop was for the purpose of a temporary detention (which the Court finds to be contrary to the evidence) the Court further finds that the illegal stop and illegal arrest was based on bare suspicion and not reasonable suspicion and accordingly cannot justify the arrest, search and seizure.
From our study of the record and the applicable law, we believe that the evidence supports the court's factual findings, but we must reject the conclusions drawn from those findings.
In order to effect a temporary stop and detention of a suspect, a law enforcement official need not have probable cause. Instead, he must have only a well-founded suspicion of criminal activity. State v. Payton, 344 So.2d 648 (Fla.2d DCA 1977). This suspicion must be based on facts which the officer observes in the light of his knowledge and experience. Taylor v. State, 384 So.2d 1310 (Fla.2d DCA), review denied, 392 So.2d 1380 (Fla. 1980). Under these standards, we think that a temporary stop of appellees was justified because the circumstances were, in our view, such as to give Sergeant DeLuna a well-founded suspicion of criminal activity when he initially ordered the stop.
While DeLuna could not be certain that the Spanish C.B. transmission emanated from one of the three vehicles, he had every reason to believe that it did. The transmission was very clear. Two of the three vehicles had C.B. radio antennas on them, and there was almost no other traffic in the area. Moreover, there were Latin males in the vehicles. The slow speed at which the vehicles were travelling suggested a heavy load of marijuana. The vehicles were obviously travelling in a caravan which was the customary method of transporting marijuana. Finally, the area was known as a disposition point for marijuana. We reach our conclusion without regard to the transmission concerning the sighting of marijuana residue on the truck prior to the stop because we accept the trial court's finding that there was no such transmission.
Having determined that there was a well-founded suspicion of criminal activity which would justify an investigatory stop, we must now turn to the court's ruling that the stop was still invalid because it amounted to what the court termed a traditional arrest. We think that to say that the initial stop was an arrest involves an incorrect assessment of the evidence. When the officers first pulled appellees over, they did nothing which went beyond the scope of a temporary stop and detention as defined in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), or section 901.151, Florida Statutes (1979). Even a person temporarily detained is not free to leave. Of course, immediately after the stop probable cause for arrest developed since the officers found both marijuana residue and the smell of marijuana all over appellees and their vehicles. See Dixon v. State, 343 So.2d 1345 (Fla.2d DCA 1977). Thus, anything *871 which occurred after that point must be judged by the law of arrest, and there is no contention that, given the right to arrest, the officers acted improperly.
Our view is not changed simply because some of the officers may have had the intent to arrest appellees prior to stopping them. Actions taken by a law enforcement officer must be examined objectively as to how they affect a suspect and not from the standpoint of what the officer's intent was. See Scott v. United States, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978); United States v. Bugarin-Casas, 484 F.2d 853 (9th Cir.1973), cert. denied, 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762 (1974). To hold otherwise would invalidate many temporary stops since whenever an officer thinks there is enough reason to stop and detain a citizen, he is likely to also have it in his mind that an arrest might occur. The mere fact that an officer makes a stop for the purpose of effecting an arrest upon the erroneous belief that he has probable cause does not mean that the stop cannot be sustained if the officer had the requisite well-founded suspicion. If he obtains probable cause on the scene before he effects the arrest, the resultant arrest is perfectly proper.
That the officers used their sirens and flashing lights and had their guns drawn also did not change the stop into an arrest. Obviously, an officer cannot stop a vehicle in the darkness without making an appropriate signal. Moreover, where there is a clear possibility of the type of criminal activity which the officers believed they were encountering in the present case, we cannot fault them for having their guns at the ready for their own protection. We know of no authority which limits the right of police to display a weapon where necessary to make a stop. To the contrary, the United States Supreme Court, in defining the concept of a temporary stop, has indicated that it can involve the display of force or authority. Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Terry v. Ohio, 392 U.S. at 19, 88 S.Ct. at 1878-79, 20 L.Ed.2d at 904-05.
We reverse the order of suppression and remand the case for further proceedings consistent with this opinion.
BOARDMAN, A.C.J., and RYDER, J., concur.