532 So.2d 1091 (1988)
Willie Lee HARPER, Appellant,
v.
The STATE of Florida, Appellee.
No. 86-2853.
District Court of Appeal of Florida, Third District.
August 30, 1988.
Rehearing Denied September 29, 1988.
*1092 Bennett H. Brummer, Public Defender and Harold Mendelow, Sp. Asst. Public Defender, for appellant.
Robert A. Butterworth, Atty. Gen. and Margarita Muina Febres, Asst. Atty. Gen., for appellee.
Before SCHWARTZ, C.J., and BASKIN and FERGUSON,[*] JJ.
SCHWARTZ, Chief Judge.
Harper appeals from a conviction, after jury trial, of first degree murder, armed robbery and burglary. His central point claims that evidence which provided the first indication of his involvement in the crimes and which led to his identification as one of the principals was unconstitutionally taken from his person. To the contrary, we conclude that the evidence was the product of a lawful search and seizure and therefore affirm the judgment below.
For once, the sequence of events which gave rise to the issue before us may accurately be described as a real life "scenario." It began on August 25, 1985, when the Modernissimo Furniture Store in Miami was burglarized, and three men inside were held up at gunpoint by unknown perpetrators. One of the victims, Jorge Palomo, a citizen and resident of El Salvador, was shot and killed. For a few days, the crime was a legitimate "whodunit"  the police had no indication as to the identity of the offenders. On September 5, however, in the course of an unrelated investigation of a robbery at an apartment which served as a well known cocaine crack house, officers discovered credit cards in the name of Palomo and one of the other victims of the Modernissimo robbery. Based upon that fact, a concededly valid search warrant was secured for the crack house. It named as the objects of the search, evidence in the form of various items which had been used or taken in the crimes.[1]
When the warrant was executed on September 8 by members of a police SWAT team, they found Harper, a stranger to them, in the apartment along with several other persons. He was standing next to a kitchen counter on which a quantity of cocaine was in plain view; nearby also was a butane torch commonly used in the preparation of crack. As is apparently their wont, see Bastien v. State, 522 So.2d 550 (Fla. 5th DCA 1988), the officers immediately placed Harper face down on the floor and cuffed his hands behind him. He was asked his name and responded. When the detectives requested physical identification, Harper said that it was "in [his] back pocket [and to] take it out." The officers did so, and the most serendipitous event of all then occurred. While looking through the wallet, which had been removed from the defendant's back pocket, to locate his i.d., Detective Fisten discovered several Salvadorian bills which were at once tied to Palomo, the Salvadorian murder victim. Harper, about whom they previously had known nothing, became an obvious suspect. The officers went with him to the police station where, after appropriate Miranda *1093 warnings, he confessed to his involvement in the offenses. As a result, other evidence was secured, including the identification of his fingerprint at the scene. The totality of the evidence was such that there is no question of its sufficiency to support the convictions.
Harper does, however, strenuously contend that the seizure of the Salvadorian currency, which was undeniably decisive in the case against him, was without constitutional justification and that both it and the other evidence against him, which was just as clearly the Wong Sun product of that seizure, should have been suppressed below. Although the question is surely not free from difficulty, we hold, however (1) that the SWAT team made no more than a Terry stop of Harper which (2) was properly based upon a founded suspicion of criminal activity arising from his proximity to the drugs and paraphernalia contained in the crack house and (3) that the evidence was validly discovered in a search for identification as an appropriate aspect of the Terry stop. Accordingly, we uphold the search and seizure in question.
1. First, we conclude that the circumstances of Harper's seizure within the crack house  a place notorious for the presence, use and distribution of crack cocaine and in which evidence of a capital crime had been discovered and was being sought  amounted to a Terry v. Ohio[2] stop of his person rather than an arrest requiring probable cause.[3] On two recent occasions, we have considered similar questions in factual contexts which did not represent nearly so great and apparent danger to the police as the one here. See Ruiz v. State, 526 So.2d 170 (Fla. 3d DCA 1988); State v. Lewis, 518 So.2d 406 (Fla. 3d DCA 1988). In those cases, we held that an investigatory stop did not ripen into a custodial arrest merely because drawn guns were used, Ruiz, 526 So.2d at 172; Lewis, 518 So.2d at 407-08, or because the defendant was physically restrained by being required to lie prone on the ground. Ruiz, 526 So.2d at 172. The only variation on that theme here is that Harper was handcuffed. Under these circumstances, as was specifically held in United States v. Bautista, 684 F.2d 1286 (9th Cir.1982), cert. denied, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983), which was cited in Ruiz and Lewis, this fact makes no difference. But cf. State v. Belieu, 50 Wash. App. 834, 751 P.2d 321 (1988).
2. Next, we conclude that the Terry stop itself was a constitutionally supported one. It is true, as the defendant argues, that because there was no information to connect Harper with the inculpatory material which was the only subject matter of the warrant, see 2 W. LaFave, Search and Seizure § 4.9(c) (2d ed. 1987),[4] there is no basis for upholding his seizure and the subsequent search as incident to the warrant itself. Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); Julian v. State, 528 So.2d 427 (Fla. 2d DCA 1988); Bastien v. State, 522 So.2d at 550; Cerna v. State, 693 S.W.2d 570 (Tex. Crim. App. 1985); 2 W. LaFave, supra, § 4.9(c).[5] *1094 Nevertheless, the fact that police are engaged in serving a search warrant surely does not detract from their ability to engage in constitutionally authorized methods of law enforcement when they lawfully come upon situations which justify that particular conduct, such as the use of a Terry stop in the investigation of a person reasonably suspected of an offense. 2 W. LaFave, supra, § 4.9(e); State v. Torres, 197 Conn. 620, 500 A.2d 1299 (1985) (Terry applicable even if Michigan v. Summers is not).
In this case, the founded or reasonable suspicion constitutionally required to support the Terry stop we have identified is readily apparent. Harper was found in a base house within feet of cocaine on one side and a torch which was at once a potential weapon and an item of narcotics paraphernalia, on the other. While his mere proximity, particularly when others were also present, may not have been sufficient to constitute probable cause to believe Harper was guilty of unlawful possession, see Johnson v. State, 456 So.2d 923 (Fla. 3d DCA 1984), the present circumstances were more than sufficient to meet the markedly reduced standard of founded suspicion. Ruiz, 526 So.2d at 172; Lewis, 518 So.2d at 408; State v. Perera, 412 So.2d 867 (Fla. 2d DCA 1982), pet. for review denied, 419 So.2d 1199 (Fla. 1982). Hence the seizure of Harper's person under Terry was permissible.
3. We turn now to the ultimate physical acts which actually secured the evidence in question  the retrieval of Harper's wallet and the revelation of its contents. In our view, this conduct was justified on just the ground upon which it was based at the scene, as an appropriate means to secure Harper's papers so as to determine his identity.
As the cases from Terry itself to the present reflect and emphasize, one of the basic reasons for, and necessarily one of the primary functions of the investigatory stop is to ascertain the identity of the suspect. Terry, 392 U.S. at 1, 88 S.Ct. at 1868, 20 L.Ed.2d at 889; Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 617 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.") (citations omitted); United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). Accordingly, it is widely held that a request, even a persistent or intrusive one, that a detained suspect produce identification papers is an appropriate and authorized aspect of a Terry seizure. United States v. Adegbite, 846 F.2d 834 (2d Cir.1988); United States v. Jones, 759 F.2d 633 (8th Cir.1985), cert. denied, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985); United States v. Vanichromanee, 742 F.2d 340 (7th Cir.1984); see United States ex rel. Hines v. LaVallee, 521 F.2d 1109 (2d Cir.1975), cert. denied, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976); cf. Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (implying, by refusing to reach validity of statute making refusal to identify oneself a crime by ruling that stop was not based upon reasonable suspicion, that stop for identification would be authorized by founded suspicion); Hallock, Stop-and-Identify Statutes After Kolender v. Lawson: Exploring the Fourth and Fifth Amendment Issues, 69 Iowa L.Rev. 1057, at 1066-67 (1984). Thus, the officers' request for identification was undoubtedly justified.
The further issue presented here, however, is whether their self-help in securing the i.d. was proper when, as here, the defendant could not produce it himself; whether, in other words, an officer may *1095 conduct a non-consensual[6] search for the identification the model of a Terry stop entitles him to request and thus  necessarily though impliedly  to receive. We hold that such a search is consistent with fourth amendment guarantees. In so doing, we follow the holding and reasoning of the leading case of State v. Flynn, 92 Wis.2d 427, 285 N.W.2d 710 (1979), cert. denied, 449 U.S. 846, 101 S.Ct. 130, 66 L.Ed.2d 55 (1980), which is the primary subject of a characteristically thoughtful treatment of the issue by Professor LaFave. See 3 W. LaFave, supra, § 9.4(g). In Flynn, an officer observed two men emerge from an alley, approached them because one fit the general description of a burglary suspect and requested that they produce identification. Flynn refused. The court upheld the subsequent taking of his wallet and the evidence of his identity it revealed, stating:
It is important to note that ... Adams [v. Williams, 407 U.S. at 143, 92 S.Ct. at 1921, 32 L.Ed.2d at 612 [1972], does not limit] the authority of a police officer acting with reasonable suspicion to simply stopping the suspected individual temporarily. In Adams, the court stated that an officer may stop a person under such circumstances "in order to determine his identity... ."
Indeed, unless the officer is entitled to at least ascertain the identity of the suspect, the right to stop him can serve no useful purpose at all. The suspect need only wait for what may be presumed to be a reasonable time, and then proceed on his way. Ignorant of even the person's name, the officer must either attempt to follow the suspect in the hope that he will discover some clue as to his identity, or surrender the potential lead and continue his investigation along other lines. Particularly where the officer is confronted with a number of potential suspects, limiting his options in this manner could have a perplexing effect on law enforcement efforts.
* * * * * *
To accept defendant's contention that the officer can stop the suspect and request identification, but that the suspect can turn right around and refuse to provide it, would reduce the authority of the officer granted by [the statute] and recognized by the United States Supreme Court in Adams ... to identify a person lawfully stopped by him to a mere fiction. Unless the officer is given some recourse in the event his request for identification is refused, he will be forced to rely either upon the good will of the person he suspects or upon his own ability to simply bluff that person into thinking that he actually does have some recourse. In our view neither of these alternatives is satisfactory, nor is either called for under the Fourth Amendment.
* * * * * *
In spite of the gravity with which we view any intrusion upon an individual's personal rights, however, we are unable to say that under the facts of this case the officer's conduct was unreasonable.
* * * * * *
These officers were not fishing for whatever evidence they could find, but sought merely to learn [the] defendant's identity. We believe that under the circumstances ... they had a right to know his identity.
Flynn, 92 Wis.2d at 440, 442, 447, 285 N.W.2d at 716, 717, 719; accord State v. Wilcox, 180 N.J. Super. 452, 435 A.2d 569 (App.Div. 1981), cert. denied, 88 N.J. 491, 443 A.2d 706 (1981); see State v. DeJesus, 216 Neb. 907, 347 N.W.2d 111 (1984). Contra People v. Williams, 63 Mich. App. 398, 234 N.W.2d 541 (1975). We thoroughly agree.
Moreover, there is no principled reason for failing to apply the doctrine announced in Flynn to the facts of this case. We treat each of the possible distinctions as follows:
(a) Although Flynn simply refused to produce his identification, we think it *1096 makes no difference that Harper could not physically do so if he wanted to. Given, as we have already said, that the restriction of his movement was reasonably necessary in the course of this particular Terry stop, see United States v. Bautista, 684 F.2d at 1289, and our acknowledgment that he did not consent to the actual search effected,[7] his position may be deemed to be conceptually the same as Flynn's, and the constitutional issue of whether an involuntary search for identification may be justified remains the same. We have already answered that question in the affirmative.
(b) While we acknowledge and agree with LaFave's observation that an identification search should be limited to the examination of wallets and other repositories of identification papers "only to the extent necessary to find a driver's license or similar document" [e.o.], 3 W. LaFave, supra, § 9.4(g), at 546, the officer's retrieval and inspection of the wallet did not go beyond that limited scope and the discovery of the currency occurred only through its inadvertent, plain view observation while that examination was taking place. See Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Menendez v. State, 368 So.2d 1278 (Fla. 1979); Cobb v. State, 378 So.2d 82 (Fla. 3d DCA 1979), cert. denied, 388 So.2d 1111 (Fla. 1980).
(c) The fact that Harper voluntarily told the officers his name when questioned is similarly immaterial. Specific documentation may be, as here, required to determine identity and "to verify that the person who stated his name was ... in fact, [the person] named... ." State v. Gums, 69 Wis.2d 513, 521, 230 N.W.2d 813, 818 (1975); United States v. Hunter, 471 F.2d 6, 7 (9th Cir.1972); Soelhe v. State, 60 Wis.2d 72, 208 N.W.2d 341 (1973).
In sum, there was no constitutional deficiency in the actions of the police officers in this case. We must observe that, although the preceding analysis may have been a lengthy one, it has arrived at a destination which equates to the very decision reached by the officers in a time and place of emergency. What we acknowledge was our first reaction to this case  that the policemen who executed a search warrant in a first degree murder case on a crack house, immobilized a person inside and secured his identification papers simply did nothing wrong  has been validated by what we deem the applicable law. After all, Amendment IV proscribes only "unreasonable searches and seizures." We apply here what was previously said in State v. Delgado, 402 So.2d 41, 43 (Fla. 3d DCA 1981):
[The officer's] actions were entirely appropriate as measured by the standards of both good police work and the constitution. As they usually do, the common conception to the contrary notwithstanding, these standards exactly coincide in the present case.
We have examined the remaining points on appeal and find no error.[8]
AFFIRMED.
NOTES
[*] Judge Ferguson did not hear oral argument.
[1] Notwithstanding the notorious nature of the premises as a place for the sale and use of cocaine, the subject of the warrant did not relate to narcotics. The peripheral significance of this fact is treated in note 4 infra and accompanying text.
[2] 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[3] We again repeat and apply the guidelines stated in the concurring opinion in Bailey v. United States, 389 F.2d 305, 314 (D.C. Cir.1967), as quoted in United States v. White, 648 F.2d 29, 33-34 (D.C. Cir.1981), cert. denied, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 235 (1981), and adopted in State v. Lewis, 518 So.2d 406, 407 (Fla. 3d DCA 1988):

Among the circumstances courts consider when making this decision are: the officer's intent in stopping the citizen; the impression conveyed to the citizen as to whether he was in custody or only briefly detained for questioning; the length of the stop; the questions, if any, asked; and the extent of the search, if any, made.
[4] If the subject of the warrant had been drugs and paraphernalia which were well known to have been present at the base house, it seems clear that Harper's presence there in proximity to the contraband would have justified a full scale search of his person under the warrant. See 2 W. LaFave, supra § 4.9(c), and cases cited at 296 nn. 38-39.
[5] By way of eliminating alternative arguments which might be advanced to support the search, it may be pointed out that the perhaps permissible frisk for weapons which might apply in the execution of any search warrant for self-protective purposes, see 2 W. LaFave, supra, § 4.9(d), cannot apply because the facts of the instant case, in which the officers (a) went far beyond such a frisk and (b) were not on reasonable notice of the existence of any weapon, simply do not comply with the prerequisites of that rule. State v. Allen, 93 Wash.2d 170, 606 P.2d 1235 (1980); 2 W. LaFave, supra, § 4.9(d).

Similarly, a detention under Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), could not be sustained if only because, by its terms, Summers does not apply to a case in which the search warrant merely authorizes a search for evidence, Summers, 452 U.S. at 692, 101 S.Ct. at 2587, 69 L.Ed.2d at 340; 2 W. LaFave, supra, § 4.9(e), at 310 n. 108, as did the one in this case.
[6] While the state, we hope with tongue-in-cheek, argues to the contrary, we cannot find that Harper, placed stomach-down with his hands cuffed behind him, effected a free and voluntary consent for the search of his person. See Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Avery, 531 So.2d 182 (Fla. 4th DCA 1988).
[7] See supra note 6.
[8] The appellant's contention, citing Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), that Harper was unlawfully confined in the police station and that his subsequent confessions were therefore inadmissible, is apparently entirely interrelated with the claim, which we have rejected, that the currency which formed the basis of the police action was unlawfully secured. There is no separate contention made either below or here that an arrest had taken place and that the Salvadorian money alone was insufficient to create probable cause to justify it. Consequently, we do not pass upon any such claim here. In any event, Harper has not sustained his burden of establishing that his confinement was a non-consensual one. State v. Dodd, 396 So.2d 1205 (Fla. 3d DCA 1981), aff'd on other grounds, 419 So.2d 333 (Fla. 1982), and cases cited; see Rector v. State, 532 So.2d 16 (Fla. 3d DCA 1988).