636 So.2d 1316 (1994)
Elmer Leon CARROLL, Appellant,
v.
STATE of Florida, Appellee.
No. 79829.
Supreme Court of Florida.
April 14, 1994.
Rehearing Denied June 9, 1994.
James B. Gibson, Public Defender, James R. Wulchak, Chief, Appellate Div., Asst. Public Defender, and Christopher S. Quarles, Chief, Capital Appeals, Asst. Public Defender, Seventh Judicial Circuit, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen., and Richard B. Martell, Asst. Atty. Gen., Tallahassee, for appellee.
*1317 PER CURIAM.
Elmer Leon Carroll appeals his convictions for first-degree murder and sexual battery on a child under twelve years old and his resulting sentences, including the sentence of death. We have jurisdiction under article V, section 3(b)(1) of the Florida Constitution, and affirm the convictions and sentences.
On October 30, 1990, at about 6 a.m., Robert Rank went to awaken his ten-year-old stepdaughter, Christine McGowan, at their home in Apopka. When she did not respond to his calls, Rank went into her bedroom and found her dead. Shortly thereafter, Rank noticed that his front door was slightly ajar and that his pickup truck he had parked in the yard with the keys in it the night before was missing. When the police arrived, they determined that Christine had been raped and strangled. A BOLO was issued for the missing truck, which was a white construction truck bearing the logo ATC on the side.
Debbie Hyatt saw a white pickup truck parked near her residence east of Orlando on Highway 50 as she left for work about 6:50 a.m. About a mile down the road, she saw a man whom she later identified as Carroll walking in an easterly direction along the highway away from the truck. She described him as having long scraggly hair and wearing a brown jacket. She did not think too much about it until she later heard over the radio that the police were looking for a white pickup truck bearing the ATC logo. After checking to see that the truck she had seen had the ATC logo described in the radio bulletin, she called the police. When sheriff's deputies arrived, she told them about first seeing the truck and the man walking down the road.
Carl Young, a state wildlife officer, was travelling on State Road 520 in Orange County on the morning of October 30, 1990. At a point near the intersection of Highway 50, Young noticed a man with shoulder length hair wearing a brown jacket walking down the highway. Young thought this was strange because he was not carrying anything. The man looked back over his shoulder at Young as he passed. After turning onto Highway 50 and proceeding west, he saw a deputy sheriff behind a white pickup truck with his revolver drawn. Young went back to the scene to render assistance. By this time, another deputy had arrived, and he heard Debbie Hyatt tell them about the man she had seen walking down the highway away from the truck. Young recalled that her description resembled the person that he had just passed. Young drove back to where Carroll was continuing to walk down the road. Young called to him, but he kept on walking. Young pulled his gun and ordered Carroll to lie down on the ground. Young made a search for weapons and found a box cutter razor blade and some keys. Through radio communication with a deputy who remained at Rank's truck, it was determined that a number on the keys matched a number on the truck. Young and a deputy who had arrived to assist him then placed Carroll under arrest.
At the trial, two other witnesses testified that they had seen the man they identified as Carroll about 6 a.m. at a 7-11 store near Apopka. The witnesses said that Carroll was driving a white truck with the ATC logo. It was also discovered that Carroll was a resident of a halfway house located next door to the Rank home. A resident of the halfway house testified that Carroll had told him that the girl who lived next door was "cute, sweet and liked to watch him make boats." She was seen talking to a man next door who may have been Carroll the day before the murder. Semen, saliva, and pubic hair recovered from the victim were consistent with that of Carroll. One DNA profile of a specimen obtained from the victim matched Carroll's DNA profile. Blood was found on Carroll's sweatshirt and on his penis.
In addition to contesting guilt, Carroll raised the defense of insanity. The State and the defense presented conflicting psychiatric testimony on the issue of competence. The jury found Carroll guilty of both charges. Following a penalty phase proceeding, the jury returned a recommendation of death by a vote of 12-0. Thereafter, the trial judge sentenced Carroll to death.

GUILT PHASE
Carroll first argues that the court should have suppressed the keys that tied *1318 him to Rank's truck because he had been illegally arrested when the keys were discovered. He insists that he had been arrested without probable cause by the time he was held at gunpoint and made to lie down on the ground. He asserts that the keys and all the evidence seized from his person, including the hair and blood samples, and the DNA test must be suppressed as fruits of the poisonous tree. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The State responds that Carroll was not arrested until after the keys were found and that the trial judge was correct in finding that Carroll had been stopped upon a well-founded or reasonable suspicion. The State says that the keys were properly seized pursuant to Officer Young's search for weapons. We agree.
The fact that Carroll had been seen walking along a deserted highway in the vicinity of and in a direction away from the abandoned truck, together with the other circumstances known to Officer Young, were sufficient for him to temporarily detain Carroll pursuant to the principles of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The stop was not necessarily converted into an arrest because the officer drew his gun and directed Carroll to lie on the ground. See State v. Ruiz, 526 So.2d 170 (Fla. 3d DCA) (investigatory stop not converted into arrest even though officers with guns drawn directed defendant to lie prone on the ground), review denied, 534 So.2d 401 (Fla. 1988), cert. denied, 488 U.S. 1044, 109 S.Ct. 872, 102 L.Ed.2d 995 (1989); State v. Perera, 412 So.2d 867 (Fla. 2d DCA) (fact that officers had weapons drawn did not convert temporary detention into formal arrest), review denied, 419 So.2d 1199 (Fla. 1982).
During the course of an investigatory stop, the police are entitled to take such action as is reasonable under the circumstances. Reynolds v. State, 592 So.2d 1082 (Fla. 1992). Because Officer Young was questioning a person who may have recently committed a murder, he was justified in being concerned, and his actions were reasonable. He was entitled to make a search for weapons, and found a razor blade during the search. The officer testified that he then felt an object in Carroll's pocket which was hard to his touch. He said he thought that it might be a weapon. When he removed it, he found that it was a set of keys. There is sufficient evidence in the record to support the trial judge's denial of the motion to suppress. See Doctor v. State, 596 So.2d 442 (Fla. 1992) (in the course of legitimate frisk for weapons during temporary stop, police may seize weapons or objects which reasonably could be weapons).
Carroll also complains that in his testimony one of the deputies made two unsolicited remarks which were fairly susceptible of being interpreted by the jury as a comment on Carroll's failure to testify. The trial court denied defendant's motions for mistrial, and in each instance offered to give a curative instruction which was refused. At the outset, we do not believe that the statements at issue were fairly susceptible as being interpreted as comments upon Carroll's failure to testify. In any event, even if they could have been so interpreted, we are convinced beyond a reasonable doubt that any error was harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). See Brannin v. State, 496 So.2d 124 (Fla. 1986) (impermissible comment on right to remain silent held harmless error where actual guilt was largely uncontested and primary theory of defense was based on insanity).
Carroll also complains of certain questions the prosecutor asked Dr. Danziger, a psychiatrist, on cross-examination. Dr. Danziger had studied Carroll's previous medical records in preparation for his testimony that Carroll was insane at the time the crime was committed by reason of an alcoholic blackout. The prosecutor asked him whether he considered among those records the reports of two instances in which Carroll had used the theory of an alcoholic blackout to defend against charges of committing sexual acts with children. After the defense's objection and motion for mistrial were denied, the doctor admitted that the records reflected these facts, but he did not know whether they were so. Contrary to Carroll's argument, the prosecutor was entitled to cross-examine Dr. Danziger as to those portions of the records which he admitted he *1319 considered that were inconsistent with his diagnosis. See Parker v. State, 476 So.2d 134 (Fla. 1985).
The prosecutor also asked Dr. Danziger if Carroll had been in State custody for most of the last ten years and if, during that time, he had been subject to frequent observation by mental health professionals. The purpose of the question was to demonstrate that on only one occasion had any mental health professional recorded an act which could be classified as a psychotic symptom such as that testified to by Dr. Danziger. Considering the minimal relevance of the inquiry, we believe that the prosecutor's reference to state custody was erroneous and that defendant's objection should have been sustained. However, the error was harmless beyond a reasonable doubt. Finally, Dr. Danziger was asked whether or not Carroll would still desire to have sex with young children when his schizophrenia was in remission. The judge properly sustained the objection. We find no abuse of discretion in the denial of the defendant's motion for mistrial. See Johnston v. State, 497 So.2d 863 (Fla. 1986).
We summarily deny Carroll's contention that the trial judge erred in denying his motions with respect to the propriety of the DNA testing. See Correll v. State, 523 So.2d 562 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988); Robinson v. State, 610 So.2d 1288 (Fla. 1992), cert. denied, ___ U.S. ___, 114 S.Ct. 1205, 127 L.Ed.2d 553 (1994). Defense counsel was permitted to voir dire and extensively cross-examine the State's expert.

PENALTY PHASE
In his sentencing order, the trial judge found three aggravating circumstances: (1) Carroll was previously convicted of two previous felonies involving the use or threat of violence to the person; (2) the capital felony was committed while Carroll was engaged in the commission of a sexual battery; (3) the capital felony was especially heinous, atrocious, or cruel. The judge found no statutory mitigating factors but concluded as a statutory mitigating factor that Carroll suffered from "some possible mental abnormalities and has an antisocial personality."
Carroll first argues that the court improperly found that the murder was especially heinous, atrocious, or cruel. On this point, the trial judge made the following findings:
On the evening of October 29, 1990, Christine McGowan went to bed at approximately 8:00 p.m. She was alone at home with her step-father, Robert Rank. Mr. Rank went to bed around 11:00 p.m. He got up at about 12:00 a.m. to get a drink of tea. Prior to returning to bed he checked on Christine and did not find anything amiss.
Mr. Rank woke up just before 6:00 a.m. and went out to check on the noise being made by a dog. He then went to Christine's room, where he found the door closed. (The door to her room was open at 12:00 a.m.) He opened the door and found Christine face down on the bed. While attempting to wake her, he noticed blood between her legs and that she felt cold. Mr. Rank then summoned help.
Dr. Thomas Hegert testified at the trial and the sentencing hearing to the following:
1. That he performed an autopsy on Christine McGowan on October 30, 1990.
2. That the cause of death in this case was due to asphyxia or lack of oxygen to the brain as a result of mechanical obstruction of the airway, i.e., strangulation.
3. That the victim had injuries to her mouth-upper lip that was consistent with someone holding a hand over the child's mouth and pressing downward.
4. That the victim had a blunt force trauma injury to the left side of her head that was consistent with a blow to the head.
5. That the victim had injuries to her neck that consisted of abrasions and contusions.
6. That the victim's vagina was torn between 4:00 o'clock and 8:00 o'clock and there were contusions around the vagina. That these injuries were consistent with sexual intercourse.

*1320 7. That the type of pain that the victim experienced as a result of the tearing or ripping of her vagina was consistent with the pain associated with child birth.
8. That there was a blue contusion about the anal opening of the victim, along with redness and irritation of the rectum of the victim. Dr. Hegert said those injuries were consistent with attempted penetration of the anus by a penis or other object of similar configuration.
9. That the blow to the head of the victim would not have caused her to become unconscious and he was of the opinion that she was conscious during this ordeal.
10. That it would take 3 to 4 minutes to cause death by complete obstruction of the airways.
11. That the victim would be conscious 1 to 2 minutes before losing consciousness.
12. That the victim would be aware of what was going on and would be subject to the fear and apprehension of not being able to breathe.
13. That the victim was alive and conscious when the injuries to her vagina occurred and could feel pain.
The evidence clearly establishes beyond a reasonable doubt that young Christine McGowan did not meet a swift, merciful and relatively painless death. The Defendant on the night in question entered her home without leaving a sign of forced entry. The evidence showed Christine McGowan received a blow to her head, as she was more than likely trying with all the fiber of her being to resist this uncivilized and barbaric attack. The evidence showed that the Defendant with his penis literally ripped her vagina apart while he raped her. The evidence also showed he attempted to have anal intercourse with her.
The agony, the pain, the horror that this child must have suffered prior to her death is evident. The pain that she endured as a result of this savage and barbaric act coupled with the knowledge that she was not able to breathe is beyond comprehension. Death by strangulation is not instantaneous. Dr. Hegert testified she would be conscious for one to two minutes prior to becoming unconscious. During this time, this child of tender years would experience fear, anxiety, emotional strain and perhaps the foreknowledge of impending doom.
If any crime meets the definition of heinous, atrocious or cruel, it is this case. The Court finds this aggravating factor present.
This finding was supported by the evidence.
Carroll also argues that the court erroneously rejected the statutory mitigating circumstances (1) that the murder was committed while Carroll was under the influence of extreme mental or emotional disturbance and (2) that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Referring to the first of these mitigating circumstances in the sentencing order, the judge extensively reviewed the testimony of several mental health experts as well as other witnesses and concluded with the following statement:
Based upon all the testimony there are two conclusions one could arrive at after reviewing the testimony. One, the Defendant at the time of the murder was under the influence of an extreme mental or emotional disturbance. Or that the Defendant was not under the influence of an extreme mental or emotional disturbance at the time of the murder and that his actions prior to the murder were typical of a person with an antisocial personality.
In determining whether a mitigating circumstance is applicable in a given case, the trial court may accept or reject the testimony of an expert witness just as the court may accept or reject the testimony of any other witness. Bates v. State, 506 So.2d 1033 (Fla. 1987).
The Court after carefully evaluating and analyzing the testimony of Doctors McMann, Danziger, and Benson finds that their testimony is not sufficient to establish this mitigating factor to the standard required by law. This Court is not reasonably convinced that this crime was committed while the Defendant was under the influence of extreme mental or emotional disturbance. There is no testimony from *1321 any witness that the Defendant was exhibiting any bizarre behavioral characteristics at the time of the murder or sexual battery. On the contrary, the evidence showed that these were the acts of a coldblooded; heartless; child molester-killer who stealthily entered the victim's home; raped and murdered her; took her stepfather's vehicle and later had a cup of coffee at the 7-11.
The judge also found that while Carroll may have been emotionally disturbed to some degree, the evidence established that he was able to appreciate the criminality of his conduct and that he could have conformed his conduct to the requirements of the law. The testimony concerning Carroll's mental condition was in sharp conflict, and the judge was entitled to make this finding. We reject Carroll's contention that the mitigating factors outweighed the appropriate aggravating factors.
Accordingly, we affirm both of Carroll's convictions and sentences, including the sentence of death.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, GRIMES, KOGAN and HARDING, JJ., concur.
SHAW, J., concurs in result only.