GREEN, Judge.
Appellant, Jose Satumino-Boudet, appeals his conviction and sentence for drug trafficking charges. Boudet was convicted after he pled nolo contendere to the charges, but he specifically reserved his right to appeal the denial of his motion to suppress. We affirm the denial of this motion for the reasons which follow.
The salient facts are basically undisputed. In March 1989, the narcotics section of the Metro-Dade Police Department conducted a drug investigation at the South Dade home *190 of one William Daniels a/k/a “Pistol Pete”. This investigation began when a package of narcotics mailed to Colorado was traced back to Daniels’ residence. Two plain-clothed detectives, Richard Iturralde and Marsha Bales, went to Daniels’ residence in an unmarked vehicle to investigate the package. They approached Daniels as he was standing at his mailbox, identified themselves as police officers and informed him that they were conducting a narcotics investigation. Detectives Iturralde and Bales then obtained Daniels’ verbal consent to a search of his residence. At some point during the search, detective Iturralde exited Daniels’ residence to place some items into his vehicle. While outside, Iturralde saw Boudet drive up and stop in front of Daniels’ home. Iturralde asked Boudet whether he could assist Boud-et with anything. Boudet inquired whether “Pete” was home. When Iturralde suddenly remembered that Daniels’ nickname was “Pistol Pete”, he responded yes. At this point Boudet parked his car and Iturralde approached him and identified himself as a police officer who was conducting a narcotics investigation. When Iturralde asked Boudet for identification, Boudet voluntarily exited his vehicle and left his driver’s side door open.[1] Boudet produced his driver’s license and after reviewing it, Iturralde started to return the license to Boudet. As Iturralde was doing this, detective Bales emerged from Daniels’ residence to relay some information privately to Iturralde. Apparently, Bales and Daniels had been watching Itur-ralde’s encounter with Boudet from inside of the home. During the search of his home, Daniels had begun to cooperate with the police and told Bales that Boudet was his drug supplier. Daniels further said that Boudet only came to his home to sell and deliver either cocaine or marijuana and that Boudet usually sold him drugs in “eights”. Detective Bales relayed this information to detective Iturralde. Thereupon, Iturralde requested Boudet’s consent to search his ve-hide. Boudet refused to give consent to a search of his car.[2] At or about that time, both detectives Iturralde and Bales made a visual observation of a closed shoe box located on the front passenger’s floor in Boudet’s car as well as a jar of inositol located in the passenger’s seat. Iturralde testified that in his experience as a narcotics detective, inosi-tol, although a legal substance, was used primarily for “cutting” or diluting cocaine.
When Boudet declined to give his consent for a search of his car, Iturralde requested Boudet to accompany him inside of Daniels’ residence. As Boudet sat down in the living room, he was read his Miranda rights[3] by another detective. Detective Bales telephoned for a police canine unit to come to the scene for the purpose of sniffing Boudet’s car for the presence of drugs. Officer Jerry W. Hull of the canine unit arrived within approximately 30-40 minutes with a trained narcotics sniff dog. The dog was on a five foot leash and began to sniff outside of the left front of Boudet’s car. As the dog passed the opened driver’s door, the dog alerted to the positive presence of narcotics. Although leashed, the dog then aggressively leaped inside the front seat of Boudet’s car and tore open the closed shoe box on the passenger’s floorboard. The shoe box contained cocaine. The dog was then apparently removed from the car and ordered to continue the search of the remainder of the car. The dog gave a second positive alert at the seam of the passenger’s door. Detective Iturralde was informed of the two positive alerts by the dog as well as the presence of cocaine in Boudet’s car.
Boudet unsuccessfully moved to suppress the cocaine in the court below. On this appeal, Boudet argues that the trial court erred in denying his motion where Boudet was effectively arrested without probable cause when the police ordered him into Daniels’ home to await the arrival of the police canine unit. He further asserts that the *191 subsequent dog search of his car was not supported by probable cause and the state offered no exigent circumstances to justify the warrantless search.
We disagree with Boudet’s first contention that his 30-40 minute detention by the police to await the arrival of the police canine unit was the de facto equivalent of an arrest without probable cause. As both parties correctly recognize on this appeal, there are three levels of encounters between the police and citizenry. The first and least intrusive level is commonly referred to as the “consensual encounter.” Florida v. Royer, 460 U.S. 491, 497-98,103 S.Ct. 1319,1324, 75 L.Ed.2d 229, 236 (1983); Cross v. State, 560 So.2d 228, 230 (Fla.1990); Thames v. State, 592 So.2d 733, 735 (Fla. 1st DCA), rev. denied, 599 So.2d 1280 (Fla.1992); State v. Simons, 549 So.2d 785, 786-87 (Fla. 2d DCA 1989). In the consensual encounter, an officer may question anyone on the street without founded suspicion, and unless the officer attempts to prevent the individual from exercising the right to walk away, any such questioning will usually constitute a consensual encounter rather than a stop. Royer, 460 U.S. at 497-98,103 S.Ct. at 1323-24; State v. Starke, 574 So.2d 1214, 1215 (Fla. 2d DCA 1991); State v. Wilson, 566 So.2d 585, 587 (Fla. 2d DCA 1990). No Fourth Amendment protection is implicated at this level.
The second level of a police encounter involves the Terry stop[4] or the temporary investigative “stop and frisk”. A Terry stop is permissible if the detention is temporary and reasonable under the circumstances and only if the police officer has a wehfound-ed suspicion that the individual detained has committed, is committing, or is about to commit a crime. E.g., Terry, 392 U.S. at 30, 88 S.Ct. at 1884; Reynolds v. State, 592 So.2d 1082 (Fla.1992); Simons, 549 So.2d at 787; see also § 901.151, Fla. Stat. (1995). This temporary detention is deemed to be a less intrusive invasion of privacy than a formal arrest and, therefore, may be constitutionally accomplished merely on articulable or founded suspicion of criminal activity. E.g., Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Terry, 392 U.S. at 30, 88 S.Ct. at 1884; Thomas v. State, 250 So.2d 15, 17 (Fla. 1st DCA 1971). The founded suspicion needed to justify an investigatory stop is fact specific to each case, but it is to be based upon the totality of the circumstances as viewed by an experienced police officer. Kehoe v. State, 521 So.2d 1094, 1095-96 (Fla.1988); Batie v. State, 593 So.2d 1167, 1168 (Fla. 1st DCA 1992); Willis v. State, 584 So.2d 41, 42 (Fla. 3d DCA 1991), rev. denied, 595 So.2d 559 (Fla.1992).[5] “At this level ... the officer may conduct a limited search or frisk of the individual for concealed weapons where the officer is justified in believing the person is armed and dangerous to the officer or others.” Simons, 549 So.2d at 786 (citing Terry). Additionally, the officer may detain the individual even at gunpoint and/or by handcuffs for the officer’s safety without converting the Terry stop into a formal arrest. Carroll v. State, 636 So.2d 1316,1318 (Fla.), cert. denied, — U.S.-, 115 S.Ct. 447, 130 L.Ed.2d 357 (1994); Harper v. State, 532 So.2d 1091, 1093 (Fla. 3d DCA 1988), rev. denied, 541 So.2d 1172 (Fla.1989); State v. Lewis, 518 So.2d 406, 407-08 (Fla. 3d DCA 1988). The individual, however, is afforded the protections of the Fourth and Fourteenth Amendments to the United States Constitution and corresponding provisions of the state constitution. Simons, 549 So.2d at 786.
The third and final level of a police encounter is that of the formal arrest. This *192 encounter is the most intrusive' invasion of personal privacy and consequently requires a greater evidentiary showing in order to be reasonable, to wit, probable cause to believe that the person arrested has committed a crime. E.g., Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Simons, 549 So.2d at 786; see also § 901.15, Fla. Stat. (1995). As with the second level, the individual is afforded all protections guaranteed in both the federal and state constitutions. See Simons, 549 So.2d at 786.
It cannot be disputed in the case before us that Boudet’s initial encounter with the police wherein Boudet inquired about Daniels’ whereabouts and detective Iturralde requested him to produce identification was nothing more than a consensual encounter. Boudet, without question, was free to leave at that time. Boudet argues, however, that this otherwise lawful police encounter quickly escalated into a de facto arrest without probable cause when he was detained for 30-40 minutes to await the arrival of the canine unit. We disagree.
Based upon our de novo review of the evidence presented below,[6] we conclude that the police had founded suspicion to believe that Boudet was involved in the narcotics trade based upon the information received from Daniels and their personal observation of the presence of a known cocaine cutting substance and closed shoe box in Boudet’s car. Accord Rogers v. State, 586 So.2d 1148 (Fla. 2d DCA 1991) (finding reasonable suspicion where officers corroborated informant’s tip with independent observation); Lewis, 518 So.2d at 408 (upholding Terry stop after apparent delivery of cocaine by defendant). Therefore, we find Boudet’s temporary detention to await the arrival of the canine unit to be nothing more than a Terry stop utilized to dispel the police officers’ reasonable suspicion that Boudet was involved in the sale of illegal narcotics. See Lewis, 518 So.2d at 407. The fact that Boud-et was given his Miranda warnings at this time still did not serve to transform this detention into an arrest. Id. at 408.
The United States Supreme Court has acknowledged the difficulty in drawing a distinction between an investigative detention and a de facto arrest. United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615 (1985). As Sharpe instructs, a critical factor in determining the reasonableness of the detention is whether the law enforcement authorities “diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.” 470 U.S. at 686, 105 S.Ct. at 1575; see also United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). While the Sharpe Court declined to place a bright-line time limit on the investigative detention of persons or property, the Court made it clear that the detention should “last no longer than is necessary to effectuate the purpose of the stop.” 470 U.S. at 684, 105 S.Ct. at 1574 (quoting Royer, 460 U.S. at 500, 103 S.Ct. at 1325). An examination of federal and state decisions reveals that the actual time of the detention is less significant than other factors in determining whether the detention is reasonable. See United States v. French, 974 F.2d 687, 693-94 (6th Cir.1992) (holding a 45-minute delay while drug dog brought to truck stopped on highway proper where officer had already smelled what appeared to be marijuana), cert. denied, 506 U.S. 1066, 113 S.Ct. 1012, 122 L.Ed.2d 160 and cert, denied, 507 U.S. 978, 113 S.Ct. 1431, 122 L.Ed.2d 798 (1993) and cert. denied, — U.S. —, 115 S.Ct. 158, 130 L.Ed.2d 96 (1994); U.S. v. Hardy, 855 F.2d 753, 758-61 (11th Cir.1988) (finding stop properly continued total of 50 minutes to summon narcotics detection dog when drug suspects gave inconsistent stories), cert, denied, 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989); Cresswell v. State, 564 So.2d 480 (Fla.1990) (approving detention of 45 minutes while awaiting canine unit as reasonable); Rogers, 586 So.2d at 1151 (holding 25-minute detention while awaiting canine unit reasonable) (citing State v. Nugent, 504 So.2d 47 (Fla. 4th DCA 1987) (holding 30-minute delay did not transform Terry *193 stop into arrest)); Finney v. State, 420 So.2d 639, 642-43 (Fla. 3d DCA 1982) (en banc) (finding officers justified in detaining defendant for approximately 90 minutes).
Where, however, the detained individual is physically removed from the scene and involuntarily transported to the police station for questioning and/or investigation, the courts have had little difficulty in construing such a detention to be a de facto arrest requiring either probable cause or prior judicial authorization. E.g., Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) (deciding petitioner’s involuntary transportation to police station without probable cause or judicial authorization for fingerprinting purposes violated petitioner’s Fourth Amendment rights); Dunaway v. New York, 442 U.S. 200, 207, 99 S.Ct. 2248, 2253, 60 L.Ed.2d 824, 832 (1979) (holding defendant is seized, for Fourth Amendment purposes, when involuntarily taken to police station for questioning; such seizure is not roughly analogous to narrowly-defined intrusions authorized by Terry and its progeny); State v. Rivas-Marmol, 679 So.2d 808 (Fla. 3d DCA 1996) (finding defendant de facto arrested for D.U.I. where handcuffed, placed in patrol car and transported to police station for purposes of administering a breathalyzer test); State v. Delgado-Armenta, 429 So.2d 328, 330-32 (Fla. 3d DCA 1983) (finding police’s actions in taking defendant involuntarily to police station constituted significant interference with defendant’s liberty sufficient to activate Fourth Amendment rights; therefore, defendant demonstrated warrantless arrest sufficient enough to shift burden to state to show arrest was valid).
We believe that the police in the instant case detained Boudet no longer than was reasonably necessary under the circumstances for them to dispel their founded suspicion that Boudet was involved in illegal narcotics activity. Since Boudet remained at the scene at all times during this investigation and was never transported away by the police, we do not agree with Boudet’s contention that he was de facto arrested on less than probable cause.
We also do not agree with Boudet’s final contention that the search of his car was not supported by probable cause. We conclude that the police’s founded suspicion later ripened into probable cause for Boudet’s arrest and the search of this car once the narcotic-sniffing dog alerted to the presence of cocaine therein. The United States Supreme Court has held that the use of a narcotics sniff dog constitutes neither a search nor a seizure within the meaning of the Fourth Amendment. Place, 462 U.S. at 707, 103 S.Ct. at 2644-45. Accordingly, this court has said:
[Ojnce the defendant was legally stopped, the use of a sniff dog was not an unconstitutional search under the Fourth Amendment. A sniff dog’s “alert” can constitute probable cause to conduct a search. Once probable cause existed to search the vehicle, no warrant was needed to authorize the search. Just as no police officer need close his eyes to contraband in plain view, no police officer armed with a sniff dog need ignore the olfactory essence of illegality.
State v. Orozco, 607 So.2d 464, 465 (Fla. 3d DCA 1992) (alteration in original) (quoting State v. Taswell, 560 So.2d 257 (Fla. 3d DCA 1990)), rev. denied, 614 So.2d 503 (Fla.1993); State v. Williams, 565 So.2d 714 (Fla. 3d DCA 1990), rev. denied, 576 So.2d 295 (Fla.), cert. denied, 500 U.S. 955, 111 S.Ct. 2265,114 L.Ed.2d 717 (1991); see also Denton v. State, 524 So.2d 495, 498 (Fla. 2d DCA), rev. denied, 534 So.2d 398 (Fla.1988); Cardwell v. State, 482 So.2d 512, 515 (Fla. 1st DCA 1986). Moreover, once probable cause was established by the dog’s positive alert, the state was not also required to show exigent circumstances for the warrantless search of Boudet’s car because they are always presumed. Pennsylvania v. Labron, — U.S. —, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996).
For these reasons, we find that the trial court properly denied Boudet’s motion to. suppress the evidence and we affirm.
Affirmed.

.It is not entirely clear from the record how wide the door was left open. One of the state's witnesses indicated that the door was left partially opened; another testified that it was left slightly ajar, approximately six to eight inches.

. Iturralde testified that he informed Boudet of his right to decline consent since Iturralde did not have a search warrant.

. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. It has been observed by the First, Second, Fourth and Fifth Districts that Florida's search and seizure jurisprudence, at least as it pertains to traffic stops, has been substantially altered by Whren v. United States, -U.S.-, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (validating traffic stops where the officer has probable cause to believe that any traffic violation has been committed). Art. I, § 12, Fla. Const.; State v. Holland, 680 So.2d 1041 (Fla. 1st DCA 1996); State v. Corvin, 677 So.2d 947 (Fla. 2d DCA 1996); Indialantic Police Dep’t v. Zimmerman, 677 So.2d 1307 (Fla. 5th DCA 1996); Petrel v. State, 675 So.2d 1049 (Fla. 4th DCA 1996). Whren does not control Boudet's case, however, because he was not detained as a result of a traffic infraction. Clark v. State, 677 So.2d 903, 904 n. 2 (Fla. 2d DCA 1996).

. See Ornelas v. United States, — U.S. —, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (holding determinations of reasonable suspicion and probable cause for a warrantless search are entitled to a de novo review on appeal).