815 So.2d 601 (2002)
Elmer Leon CARROLL, Appellant,
v.
STATE of Florida, Appellee.
Elmer Leon Carroll, Petitioner,
v.
Michael W. Moore, Secretary, Florida Department of Corrections, Respondent.
Nos. SC94611, SC00-46.
Supreme Court of Florida.
March 7, 2002.
Rehearing Denied April 19, 2002.
*607 Gregory C. Smith, Capital Collateral Counsel-Northern Region, Andrew Thomas, Chief Assistant CCRC-Northern Region, Scott B. Mario, Staff Attorney, Office of the Capital Collateral Counsel-Northern Region, Tallahassee, FL, for Appellant/Petitioner.
Robert A. Butterworth, Attorney General, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Elmer Leon Carroll, a prisoner under sentence of death, appeals the trial court's denial of his motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, and he petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons set forth below, we affirm the trial court's order denying Carroll postconviction relief. We also deny Carroll's petition for writ of habeas corpus.

BACKGROUND
Carroll was convicted for first-degree murder and sexual battery on a child under twelve years of age. The facts in this case are set forth in greater detail in Carroll v. State, 636 So.2d 1316 (Fla.1994). The relevant facts are as follows:
On October 30, 1990, at about 6 a.m., Robert Rank went to awaken his ten-year-old stepdaughter, Christine McGowan, at their home in Apopka. When she did not respond to his calls, Rank went into her bedroom and found her dead. Shortly thereafter, Rank noticed that his front door was slightly ajar and that his pickup truck he had parked in the yard with the keys in it the night before was missing. When the police arrived, they determined that Christine had been raped and strangled. A BOLO was issued for the missing truck, which was a white construction truck bearing the logo ATC on the side.
Id. at 1317. Shortly thereafter, the truck was seen parked on the side of a highway and Carroll was observed walking about one mile down the road from the truck. Carroll was subsequently stopped and searched, and the keys to the truck were found on Carroll. Two witnesses had also observed Carroll driving the truck earlier that morning. Blood was found on Carroll's sweatshirt and genitalia, and semen, saliva, and pubic hair recovered from the victim were consistent with that of Carroll.
The jury convicted Carroll of both charges and recommended death for the first-degree murder conviction by a vote of twelve to zero. See id. at 1317. The trial court followed the jury's recommendation and sentenced Carroll to death.[1] We affirmed Carroll's conviction and sentence on *608 direct appeal. See id. at 1321. The United States Supreme Court denied Carroll's petition for writ of certiorari on October 31, 1994. See Carroll v. Florida, 513 U.S. 973, 115 S.Ct. 447, 130 L.Ed.2d 357 (1994).
Carroll timely filed his initial 3.850 motion on February 1, 1996. Thereafter, Carroll filed an amended 3.850 motion raising twenty-four claims.[2] Following a Huff[3] hearing, the trial court ordered that an evidentiary hearing be held as to five of the twenty-four claims raised in Carroll's amended motion.[4] The trial court held an evidentiary hearing on August 4-5, 1997. Subsequent to this hearing, the trial court entered an order denying relief on all of Carroll's claims. This appeal follows.

3.850 APPEAL
Carroll raises eight issues on appeal,[5] *609 several of which may be disposed of summarily because they are procedurally barred,[6] facially insufficient,[7] or without merit.[8] Carroll's remaining claims, however, warrant discussion and we will address them in turn.

*610 INEFFECTIVE ASSISTANCE OF COUNSEL
We first address the claim of ineffective assistance of counsel. In order to prove such a claim, a defendant must establish two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Rutherford v. State, 727 So.2d 216, 219-20 (Fla.1998); Rose v. State, 675 So.2d 567, 569 (Fla.1996). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Ineffective assistance of counsel claims present a mixed question of law and fact subject to plenary review based on the Strickland test. See Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999) (citing Rose v. State, 675 So.2d 567, 571 (Fla.1996)). This requires an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id.

Competency
First, Carroll alleges that abundant psychiatric testimony before, during, and since trial establishes that he was incompetent at the time of trial. Carroll's underlying claim that he was incompetent to stand trial should have been raised on direct appeal and therefore is procedurally barred. See Patton v. State, 784 So.2d 380, 393 (Fla.2000); Johnston v. Dugger, 583 So.2d 657, 659 (Fla.1991). As a corollary to the substantive competency claim, however, Carroll argues that trial counsel's ineffectiveness deprived him of a reliable competency hearing.
In this case, trial counsel filed a motion for a competency hearing on August 15, 1991. Thereafter, the trial court appointed Drs. Gutman and Danziger to evaluate Carroll for competency and sanity. In addition, the trial court requested Drs. Kirkland, Erlich, and Benson, who had previously evaluated Carroll for competency in November December of 1990, to reevaluate Carroll for competency and sanity. On November 15, 1991, the trial court held a competency hearing at which Drs. Gutman, Danziger, Kirkland, and Benson testified.[9] Of these four doctors, Dr. Benson was the only one to testify that Carroll was incompetent to stand trial.[10] On December *611 27, 1991, the trial court entered an order finding Carroll competent to stand trial based upon consideration of the expert testimony and argument of counsel at the competency hearing, as well as the experts' reports submitted to the court.
Nonetheless, Carroll argues that trial counsel's ineffectiveness in failing to provide adequate background information to the doctors deprived him of a reliable competency determination. Carroll alleges that Drs. Danziger and Gutman testified at the evidentiary hearing that based on additional background information supplied by collateral counsel, consisting of school records and affidavits from family members, they would reconsider their original opinions regarding Carroll's competency at the time of trial. The record, however, refutes Carroll's claim. Neither Dr. Danziger nor Dr. Gutman testified that in light of the additional background information provided by collateral counsel they would have found Carroll incompetent to stand trial. Thus, even assuming trial counsel was deficient for failing to provide the additional background information, Carroll has not demonstrated prejudice under Strickland. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, we find this claim was properly rejected.

Guilt Phase
Carroll also asserts that the trial court erred in denying his claim alleging that trial counsel rendered ineffective assistance during the guilt phase. Specifically, Carroll argues trial counsel was ineffective in presenting an insanity defense; trial counsel was ineffective in failing to retain a confidential DNA expert; and trial counsel was ineffective in failing to impeach the testimony of the medical expert.
First, Carroll maintains that the failure of his insanity defense is directly related to trial counsel's ineffectiveness. In particular, Carroll contends that: (1) trial counsel did virtually nothing to affirmatively present an insanity defense; and (2) trial counsel allowed the State to present damaging testimony from experts who based their opinions on incomplete information.
We find that the record refutes Carroll's allegation that trial counsel did "virtually nothing" to affirmatively present an insanity defense. First, trial counsel called several lay witnesses to testify at trial in support of Carroll's insanity defense. In particular, trial counsel called the director of the halfway house in which Carroll was residing at the time of the offense. She testified that Carroll began to act differently a couple of weeks before the alleged offense and that she spoke with him about getting counseling. Additionally, trial counsel called two bartenders from the taverns Carroll patronized the night before the victim was discovered. Both bartenders testified that they witnessed Carroll acting strangely and observed him talking to his jacket and speaking about demons and Satan.
More importantly, trial counsel called several mental health experts in support of Carroll's insanity defense. Dr. McMahon, who had examined Carroll within two days of the offense, testified that she observed Carroll to be extremely disorganized and only partially oriented. In her clinical opinion, Carroll was psychotic at the time of her interview, experiencing both auditory and visual hallucinations. Dr. Danziger testified at trial that he had three separate diagnoses for Carroll: schizophrenia *612 chronic differentiated type; alcoholism; and multiple drug abuse. Further, Dr. Danziger testified that more likely than not Carroll was not responsible for his actions and was so psychotic at the time of the offense that he was unable to distinguish right from wrong, although he conceded it was a difficult call. Dr. Benson testified that his diagnosis was paranoid schizophrenia, poly-substance abuse, and borderline intelligence quotient. In addition, Dr. Benson testified that Carroll was most likely actively psychotic at the time of the alleged crime and therefore did not know what he was doing or its consequences.[11] Hence, the record clearly refutes Carroll's allegation that trial counsel did virtually nothing to present an insanity defense.
Carroll also asserts that trial counsel's ineffectiveness in failing to provide adequate records and background information to the various medical experts permitted the State to portray Carroll as a malingerer, thereby weakening his insanity defense. Specifically, Carroll contends Dr. Gutman's trial testimony, that he believed Carroll was malingering and that Carroll had an IQ around 105-110, was devastating to the defense. Carroll maintains that had trial counsel provided Dr. Gutman with the additional information collateral counsel collected he would have testified favorably for the defense and deprived the State of its argument that Carroll was a calculating killer who feigned mental illness to avoid responsibility. In support, Carroll argues that at the evidentiary hearing Dr. Gutman admitted that after reviewing the additional information provided by collateral counsel his current diagnosis would be "mental disorder with mood, memory, personality change and cognitive decline associated with alcohol deterioration and influence on the brain."[12] Dr. Gutman also noted that the records would confirm that Carroll had evidence of a psychotic illness on or around the time of the alleged offense and that psychosis had developed.
Carroll, however, overlooks the fact that Dr. Gutman admitted at trial that his opinion regarding Carroll's IQ was inconsistent with psychological test records he had received, which showed Carroll's IQ ranging between sixty to sixty-nine and the high seventies to low eighties. Further, Dr. Gutman specifically stated at trial that he was not able to reach a conclusion regarding Carroll's sanity at the time of the offense. In fact, Dr. Gutman conceded that he was not rendering an opinion as to Carroll's mental condition at the time of the offense. Even with the additional information collected by collateral counsel, Dr. Gutman acknowledged at the evidentiary hearing that it was a close call as to whether the two statutory mental mitigating circumstances existed. Cf. Ferguson v. State, 593 So.2d 508, 511 (Fla.1992) (noting that standard for finding two statutory mental mitigators was lower than M'Naghten insanity standard). Dr. Gutman also reiterated that Carroll has a "malingering-like persona" and that his diagnosis of malingering would still be present.[13] Thus, even if we were to assume *613 trial counsel was deficient for failing to provide the additional background information, we conclude based on the record in this case that Carroll has failed to demonstrate prejudice. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, we find no error in the trial court's denial of this claim.
Carroll also claims that trial counsel was ineffective during the guilt phase for failing to retain a confidential DNA expert. At the evidentiary hearing, however, Carroll's trial counsel testified that he made an informed tactical decision not to hire a DNA expert since at the time he thought it would have done a disservice to Carroll.[14] In particular, trial counsel testified:
I thought the DNA evidence, if it was admissible, was pretty solid.... This was an F.B.I. Lab that was under no scrutiny at the time. I thought there was a real good chance that, I kind of liked what I saw with the DNA evidence that we had. If you looked at some of the probes they looked like it wasn't kind of hard to follow his testimony. I didn't think he was, really, that that was not totally strong. There was some areas where he said I can't be sure about this.... [I]f the judge said okay, I'm going to give you another DNA [expert], at the time I thought I would have really done Elmer Carroll a disservice....
In light of trial counsel's testimony at the evidentiary hearing, we find no error in the trial court's conclusion that counsel's decision not to retain a DNA expert was strategic and not "outside the broad range of reasonably competent performance under prevailing professional standards." Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and Downs v. State, 453 So.2d 1102 (Fla.1984)); cf. Jones v. State, 732 So.2d 313, 320 (Fla.1999) (holding that trial counsel was not ineffective for failing to obtain an expert to discuss effects of HIV and resulting AIDS). More importantly, even assuming trial counsel was deficient for failing to retain a DNA expert, Carroll has not demonstrated prejudice under Strickland. Carroll does not allege that the DNA evidence was inaccurate, nor does he assert that hiring a DNA expert would have uncovered any favorable evidence. Rather, Carroll merely contends that trial counsel's failure to procure a DNA expert constitutes ineffective assistance. Accordingly, we find no error in the trial court's denial of this claim.
Lastly, Carroll argues that trial counsel was ineffective during the guilt phase for acquiescing in the admission of autopsy photographs and failing to impeach the testimony of the medical examiner. We find the record refutes Carroll's claim that trial counsel acquiesced in the admission of autopsy photographs. Indeed, trial counsel objected to the majority of the photographs introduced during the medical examiner's testimony, on grounds that particular photographs were either prejudicial or duplicative. Further, even assuming trial counsel was deficient, we find that Carroll has failed to demonstrate prejudice under Strickland. We also find *614 Carroll's allegation that trial counsel was ineffective for failing to impeach the medical examiner is insufficiently pled. Carroll does not allege what, if any, favorable information could have been elicited by a more vigorous cross-examination of the medical examiner. Accordingly, we find no error in the trial court's denial of this claim.

Penalty Phase
Carroll argues that trial counsel was ineffective for failing to adequately investigate and present available evidence in support of statutory and nonstatutory mitigating circumstances at the penalty phase. Carroll contends that had trial counsel performed an adequate investigation substantial mitigation could have been established, including: Carroll committed the offense under the influence of extreme mental or emotional disturbance; Carroll's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired; Carroll suffers organic brain damage; Carroll is borderline retarded; Carroll suffers from a psychotic illness; Carroll has learning disabilities and lacks mental flexibility; contributing factors of Fetal Alcohol Syndrome exist; Carroll has a long history of alcohol and drug abuse; Carroll suffered severe physical abuse as a child, including blows to the head; Carroll suffered sexual abuse as a child; and Carroll has a possible genetically conditioned mental illness.
Specifically, Carroll contends that trial counsel failed to call as witnesses Carroll's relatives who would have testified as to Carroll's upbringing. At the post-conviction evidentiary hearing, Carroll called five family members who testified in varying degrees as to Carroll's family background and history, including physical and sexual abuse, substance abuse, and his mental problems. These family members testified that had they been asked they would have testified on Carroll's behalf at the penalty phase.
Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. 2052. However, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Id. During the evidentiary hearing, trial counsel testified that, despite his inquiries, Carroll did not provide him with the names of any witnesses who could have provided mitigating evidence. To the contrary, trial counsel testified that based upon what Carroll had told him there were no family members that could come forward and offer any useful testimony in mitigation. Nonetheless, trial counsel stated that efforts were made to locate family members but to no avail. Trial counsel also indicated that having spoken with Carroll about his life, he did not believe Carroll had a close family relationship anymore as a result of various past events.[15] While we acknowledge that counsel has a duty to investigate, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to *615 pursue those investigations may not later be challenged as unreasonable." Id.; see also Johnston v. Singletary, 162 F.3d 630, 642 (11th Cir.1998) (same); Rose v. State, 617 So.2d 291, 294-95 (Fla.1993) (trial counsel was not ineffective for failing to call family members where defendant told counsel that he had not had contact with his family for a number of years and that his family's testimony would not be helpful). By failing to respond to counsel's requests to provide trial counsel with the names of witnesses who could assist in presenting mitigating evidence, Carroll may not now complain that trial counsel's failure to pursue such mitigation was unreasonable. See Cherry v. State, 781 So.2d 1040, 1050 (Fla.2000), cert. denied, ___ U.S. ___, 122 S.Ct. 179, 151 L.Ed.2d 124 (2001).[16]
Carroll also alleges that trial counsel was ineffective for failing to call the mental health experts to testify during the penalty phase. At the postconviction evidentiary hearing, Carroll called Drs. McMahon, Danziger, and Gutman, who had testified during the guilt phase of his trial. Each of these doctors testified that had they been asked by trial counsel they could have testified during the penalty phase as to the existence of two statutory mitigating circumstances, i.e., the murder was committed while Carroll was under the influence of extreme mental or emotional disturbance, and the capacity of Carroll to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. In addition, Carroll presented testimony from two mental health experts, Drs. Crown and Toomer, who examined Carroll prior to the evidentiary hearing at the request of collateral counsel. Dr. Crown performed a standard neuropsychological evaluation of Carroll, concluding that Carroll has a full scale IQ of 81 and suffers from organic brain damage that affects his intellectual and cognitive capacities. Dr. Toomer conducted a psychological evaluation and administered several tests, including the Bender Gestalt test and Minnesota Multiphasic Personalty Inventory (MMPI). The results of the Bender Gestalt test suggested the possibility of organicity or brain damage. Dr. Toomer, however, was unable to arrive at a specific diagnosis for Carroll because "he presents symptomatology that runs the entire gamut of several personality disorders, all the way through to a major mental disorder." Drs. Crown and Toomer also testified that they believed the two statutory mitigating circumstances noted above were present. In addition, Dr. Crown indicated that he believed several nonstatutory mitigating circumstances were present, including organic brain damage, physical and sexual abuse, and learning difficulties.
In rejecting this claim, the trial court concluded that trial counsel made a strategic decision not to recall at the penalty phase the mental health experts who *616 had testified at length during the guilt phase. At the evidentiary hearing, trial counsel in part explained:
[T]he main witness in the case Dr. [Danziger]... was a good witness but was wavering. I certainly didn't want to put him on the stand and say have him waver, then the ball game was truly over because what he said he had said, and he said it in a nice professional way.
It was my call. I guess I didn't want to call the same people again just to have them ask the same series of questions maybe in a different way. I know as a prosecutor I would have enjoyed that, if I was a prosecutor in the case, after you lose the case to call the same witnesses back. You'd have a field day with something like that.
They had been persuasive, as persuasive as I thought they were going to be as to that.
It was a judgment call and I made it.
Although attorneys may differ as to this strategy, we agree with the trial court's conclusion that the decision did not fall outside the wide range of reasonable professional assistance. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. 2052; see also Johnson v. State, 769 So.2d 990, 1001 (Fla.2000) ("Counsel's strategic decisions will not be second-guessed on collateral attack."); Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000) ("Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions."). The mental health experts testified at length during the guilt phase about Carroll's mental condition, and we cannot conclude that trial counsel's decision to rely on their guilt phase testimony in arguing the existence of mitigating circumstances at the penalty phase was unreasonable in light of his concerns that the experts were wavering. See Provenzano v. Dugger, 561 So.2d 541, 546 (Fla.1990) (finding that trial counsel was not ineffective for failing to present expert testimony during the penalty phase concerning defendant's mental condition when counsel presented extensive testimony during the guilt phase that defendant was paranoid). Further, trial counsel's decision to rely on the mental health experts' guilt phase testimony at the penalty phase prevented the State from revealing damaging evidence during cross-examination of the experts, including past reports of Carroll's sexual misconduct with children.[17]
Moreover, even if trial counsel's conduct during the penalty phase was found to be deficient, Carroll would not be entitled to a new sentencing unless he demonstrated prejudice from counsel's alleged errors. Carroll "must demonstrate that there is a reasonable probability that, absent trial counsel's error, `the sentencer... would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" Cherry, 781 So.2d at 1048 (quoting Strickland, 466 U.S. at 695, 104 S.Ct. 2052); see also Rose, 675 So.2d at 571. The trial court in this case found three aggravating circumstances, one of which was that the murder was especially heinous, atrocious, or cruel. The trial court instructed the jury on three statutory mitigating circumstances, including the two statutory mental mitigators, which the mental health experts at the evidentiary hearing stated they believed to exist in this case. The jury was also instructed that it could consider any other *617 aspect of Carroll's character or record and any other circumstance of the offense. Although the trial court did not find the statutory mental mitigators, it found as a nonstatutory mitigating circumstance that Carroll suffered from "some possible mental abnormalities and has an antisocial personality."
As discussed above, several mental health experts testified at length during the guilt phase of Carroll's trial. From this testimony, the jury learned most, if not all, of the mitigating circumstances now claimed to exist. For example, evidence was presented that Carroll was suffering auditory and visual hallucinations; he had borderline intelligence and a below-average IQ; he had a seventh grade education; he had a history of drug and alcohol abuse; he began drinking at a young age and was drinking heavily by age twelve; he had experienced blackouts; he had been rendered unconscious on several occasions from blows to his head; and he suffered physical abuse as a child. Trial counsel also introduced during the penalty phase a police report documenting an incident of sexual abuse Carroll suffered as a child. Thus, the jury was aware of much of the information Carroll alleges was not introduced at trial. Nevertheless, the jury recommended a sentence of death by a twelve to zero vote, and the trial court sentenced Carroll in accordance with that recommendation. We find no error in the trial court's conclusion that even if Carroll's background and mental state had been explored in greater detail during the penalty phase, such evidence would not have changed the outcome in this case. Based upon the record and the brutal nature of ten-year-old Christine McGowan's death, the trial court concluded that Carroll has failed to demonstrate that there is a reasonable probability that, absent the claimed errors, the sentencer would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. Accordingly, we find no error in the trial court's denial of this claim.

Mental Health Evaluation
In a related issue, Carroll argues that the trial court erred in not granting an evidentiary hearing on his claim alleging that he was deprived of his right to a competent mental health expert pursuant to Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In his amended motion for postconviction relief, Carroll argued that he was denied a competent mental health evaluation because trial counsel was ineffective in failing to provide adequate background information to the mental health experts. Contrary to Carroll's assertion, the trial court did hold an evidentiary hearing on this claim. Indeed, based upon our review of the record, it is clear that Carroll was able to fully explore this issue at the evidentiary hearing. The trial court, however, denied this claim for the same reasons it had rejected Carroll's allegation that trial counsel provided ineffective assistance during the penalty phase.
As previously indicated, several mental health experts evaluated Carroll for competency and sanity prior to trial. The record reveals that these mental health experts were provided with Carroll's prison and hospital records dating back to 1980, as well as the results of the psychological testing performed upon Dr. Kirkland's request shortly after Carroll's arrest. Several experts at trial also indicated that they reviewed police reports and witness statements. Trial counsel, however, testified at the evidentiary hearing that he did not provide Carroll's school records to the mental health experts because he did not have them. Nor were the experts provided affidavits *618 from Carroll's family members regarding his upbringing. However, several of the mental health experts' reports indicate that their personal interviews with Carroll included information concerning his family history, drug and alcohol abuse, physical and sexual abuse, and low level of education. Trial counsel acknowledged at the evidentiary hearing that he did not request the mental health experts to evaluate Carroll for the purpose of providing mitigating evidence during the penalty phase because he believed the experts had conducted thorough examinations.
Even if counsel was deficient, Carroll would not be entitled to relief unless he demonstrated prejudice as a result of counsel's failure to provide the mental health experts with sufficient information or to ensure a competent evaluation. As noted above, several of the mental health experts' reports indicate that they were generally aware of Carroll's background. Further, in addition to the psychiatric and mental status examinations performed by the mental health experts, the record reveals that upon Dr. Kirkland's request a psychological evaluation of Carroll was performed and a battery of tests were administered, including the Minnesota Multiphasic Personality Inventory (MMPI), the Millon Clinical Multiaxial Inventory (MCMI), the Wechsler Adult Intelligence Scaled-Revised (WAIS-R), Rorschach, and Bender-Gestalt tests. Carroll's overall performance on the WAIS-R was not consistent with any known psychiatric or organic related illness. Similarly, Dr. Kirkland's psychiatric evaluation report indicates that the mental status examination he conducted did not reveal any evidence of organic brain damage.
The fact that Carroll has now secured the testimony of more favorable mental health experts simply does not establish that the original evaluations were insufficient. See Cherry, 781 So.2d at 1052; Rose, 617 So.2d at 295. More importantly, we find no error in the trial court's conclusion that Carroll has failed to demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, we affirm the trial court's denial of this claim.

BRADY CLAIM
Next, Carroll argues that the trial court erred in summarily denying his claim that the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Carroll alleges that the State withheld investigative notes prepared during the criminal investigation by Detectives Latrelle and Payne which contained information indicating that the victim's family suspected that Robert Rank, the victim's stepfather, was somehow involved; that Rank allegedly abused the victim; that Carroll and Rank were rumored to have smoked crack cocaine together on the day of the murder; and that another rape had recently occurred in the neighborhood.
Although the trial court did not expressly grant an evidentiary hearing as to this specific claim, it did hold a hearing as to claim 6, subpart C, in which Carroll alleged trial counsel was ineffective for failing to investigate other suspects. These claims essentially mirrored each other and both were based upon the information contained within the investigative notes.[18] *619 Moreover, it is clear from our review of the record that Carroll was provided the opportunity to sufficiently develop his Brady claim during the postconviction proceeding.
The United States Supreme Court has recently provided the following three-prong analysis for determining the merits of a Brady violation claim:
[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.
Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). With regard to the third prong, the Court emphasized that prejudice is measured by determining "whether `the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). In applying these elements, the evidence must be considered in the context of the entire record. See State v. Riechmann, 777 So.2d 342, 362 (Fla.2000); Sireci v. State, 773 So.2d 34 (Fla.2000); Haliburton v. Singletary, 691 So.2d 466, 470 (Fla.1997).
The court below denied Carroll's claim, reasoning that there was no Brady violation since Carroll personally knew or should have known whether he was acquainted with Rank, whether he took drugs with Rank on the day in question, and whether there were witnesses to his activities with Rank. On appeal, Carroll argues that the trial court's reasoning is flawed because: (1) he was incompetent and therefore unable to provide his attorney with information to help his defense; and (2) even if he had been capable of disclosing to trial counsel that he knew Rank, he obviously could not have been aware of the other information contained within the notes, i.e., that the victim's family suspected Rank was somehow involved, that Rank allegedly abused the victim, and that another rape had recently occurred in the neighborhood.
As previously discussed, a competency hearing was held in this case and Carroll was declared competent to stand trial. Thus, Carroll's first argument is without merit. Further, we find no error in the trial court's conclusion that Carroll was in the best position to provide information as to whether or not he knew Rank and whether he consumed drugs with Rank on the day in question. See Roberts v. State, 568 So.2d 1255, 1260 (Fla.1990) (denying Brady claim on basis that defendant "himself knew whether he had been drinking or taking drugs prior to the offense and also would have been aware of those who may have witnessed this"); see also Occhicone, 768 So.2d at 1042 ("Although the `due diligence' requirement is absent from the Supreme Court's most recent formulation of the Brady test, it continues to follow that a Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant.").
*620 Similarly, we find Carroll's second argument to be without merit. As noted by the State, the prosecution is not required to provide the defendant all information regarding its investigatory work on a particular case regardless of its relevancy or materiality. Further, even if we were to conclude that the State should have disclosed the information, we would find Carroll has failed to satisfy the prejudice prong of the three-part test. Trial testimony by police officers and various experts revealed that hair and blood samples were taken from Rank, but that subsequent testing ruled out his involvement. By contrast, blood was found on Carroll's sweatshirt and genitalia, and semen, saliva, and pubic hair recovered from the victim were consistent with that of Carroll. Thus, considering the investigative notes in the context of the entire record, we find no error in the trial court's denial of this claim since there is no reasonable probability that this evidence could "put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290, 119 S.Ct. 1936.
In conclusion, we find no reversible error in the trial court's denial of postconviction relief.

HABEAS CORPUS
We also deny Carroll's claim that his appellate counsel was ineffective. The issue of appellate counsel's ineffectiveness is appropriately raised in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). However, in order to grant habeas relief on the basis of ineffectiveness of appellate counsel, this Court must determine:
[W]hether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069. "The defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069; see also Knight v. State, 394 So.2d 997, 1001 (Fla. 1981).
First, Carroll asserts that appellate counsel was ineffective for failing to notify this Court of Carroll's incompetence during his direct appeal and failing to seek a stay pending his restoration to competency. To support his argument, Carroll relies on Carter v. State, 706 So.2d 873 (Fla.1997).[19] We find such reliance to be misplaced. In Carter, we addressed the issue of a capital defendant's competency during postconviction proceedings. Carter is inapplicable to appellate proceedings. Further, errors that are properly subject to appellate review are invariably reflected in the trial record. As Justice Overton recognized in Jackson v. State, 452 So.2d 533 (Fla.1984):
Competency of a defendant to stand trial and competency of a defendant to aid his counsel in an appeal are not the same. In the first instance, a defendant has to be able to advise counsel of facts and circumstances to aid in his defense. *621 In the second instance, the record has been made and counsel must make the legal decision of what issues should be appealed.
Id. at 537 (Overton, J., specially concurring). Thus, appellate counsel was not ineffective for failing to raise this issue on appeal.
Next, Carroll claims that appellate counsel was ineffective for failing to raise on direct appeal the prejudicial error caused by the admission of gruesome and inflammatory photographs. This Court has explained that the admission of photographic evidence of a murder victim is within the sound discretion of the trial court and its ruling will not be disturbed on appeal absent abuse. See Rutherford v. Moore, 774 So.2d 637, 646 (Fla.2000); Pangburn v. State, 661 So.2d 1182, 1187 (Fla.1995). "While a trial court should exercise caution in admitting particularly gruesome photographs, and in limiting their numbers, such photographs may still be relevant." Larkins v. State, 655 So.2d 95, 98 (Fla.1995). This Court has upheld the admissibility of photographs where they are relevant to "explain a medical examiner's testimony, to show the manner of death, the location of wounds, and the identity of the victim." Id. at 98.
In this case, numerous photographic slides depicting the victim's injuries were admitted into evidence during the guilt phase of Carroll's trial over defense counsel's objections. The photographs were used during the medical examiner's testimony to help explain the nature of the victim's injuries and cause of death, and were also probative in the determination of the HAC and sexual battery aggravating circumstances. We find the trial court did not abuse its discretion in admitting the photographic slides into evidence because they were relevant to show the circumstances of the crime and the nature and extent of the victim's injuries. See Mansfield v. State, 758 So.2d 636, 648 (Fla.2000) (stating that trial court did not abuse its discretion in admitting photographs depicting the mutilation of the victim's genitalia where the photographs were relevant to the medical examiner's determination as to the manner of the victim's death, and were probative in the determination of heinous, atrocious, or cruel and sexual battery aggravators); see also Rutherford, 774 So.2d at 647; Gudinas v. State, 693 So.2d 953, 963 (Fla.1997); Larkins, 655 So.2d at 98. Accordingly, appellate counsel was not ineffective for failing to raise this issue on appeal.
Carroll also argues that appellate counsel was ineffective for failing to raise the issue of the prosecutor's improper comments and arguments made during the penalty phase. This Court has held that allegedly improper prosecutorial comments cannot be appealed unless a contemporaneous objection is made. See Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998); Kilgore v. State, 688 So.2d 895, 898 (Fla. 1996). The exception to the general rule is where the improper comments rise to the level of fundamental error. See Thomas v. State, 748 So.2d 970, 985 n. 10 (Fla.1999); Kilgore, 688 So.2d at 898. In this case, trial counsel did not object to any of the comments alleged to have been improper or inflammatory. Thus, even if appellate counsel had raised this issue on direct appeal relief would have only been granted if this Court determined that the comments constituted fundamental error.
First, Carroll contends that the prosecutor essentially asked the jury to ignore its obligation to weigh aggravation and mitigation. Contrary to Carroll's assertion, the prosecutor did not suggest that the jury ignore its obligation to weigh the aggravating and mitigating circumstances. Moreover, the trial court properly *622 instructed the jury prior to deliberations of its duty to weigh the aggravating and mitigating circumstances in reaching its recommendation. Accordingly, appellate counsel was not ineffective for failing to raise this issue on appeal.
Secondly, Carroll asserts that the prosecutor sought to inflame the jury by stating that Carroll was the "boogie man" and a "creature that stalked the night" who "must die."[20] "When comments in closing argument are intended to and do inject elements of emotion and fear into the jury's deliberations, a prosecutor has ventured far outside the scope of proper argument." Garron v. State, 528 So.2d 353, 359 (Fla.1988). Although improper and ill advised, the prosecutor's isolated comments were not as egregious or cumulative in scope as in cases where this Court has found fundamental error. See, e.g., Brooks v. State, 762 So.2d 879 (Fla.2000); Ruiz v. State, 743 So.2d 1 (Fla.1999); Urbin v. State, 714 So.2d 411 (Fla.1998); Rhodes v. State, 547 So.2d 1201 (Fla.1989). Thus, appellate counsel was not ineffective for failing to raise this issue on appeal.
Carroll also alleges that appellate counsel was ineffective for failing to argue on direct appeal that Carroll did not make a knowing, voluntary, and intelligent waiver of his right to present evidence during the penalty phase. We disagree. As discussed previously, trial counsel relied on the mental health experts' guilt phase testimony to argue the existence of mitigating circumstances during the penalty phase and also introduced in evidence a police report documenting an incident of sexual abuse Carroll suffered as a child. Accordingly, we find appellate counsel was not ineffective for failing to raise this issue on appeal.[21]
Next, Carroll claims appellate counsel was ineffective for failing to argue that the instructions given to the jury regarding the aggravating circumstances were erroneous. Carroll did not object to either the prior violent felony or the murder in the course of a felony instruction at trial. Thus, Carroll's claim as to the jury instructions for these two aggravating circumstances was not preserved for appeal. Appellate counsel cannot be ineffective for failing to raise issues not properly preserved for appeal. See Johnson v. Singletary, 695 So.2d 263, 266-67 (Fla.1996); Groover v. Singletary, 656 So.2d 424, 425 (Fla.1995). Further, the prior violent felony jury instruction given in this case was in accordance with the standard jury instruction and Carroll has two qualifying felony convictions. Moreover, this Court has rejected the argument that the murder in the course of a felony aggravator constitutes an improper automatic aggravator. See Blanco v. State, 706 So.2d 7, 11 (Fla. 1997); Johnson v. State, 660 So.2d 637, 647 (Fla.1995).
*623 Trial counsel did object to the avoid arrest instruction on the basis that it was not applicable. Accordingly, Carroll contends that appellate counsel was ineffective for failing to raise this issue on appeal. Appellate counsel, however, does not have to raise every possible argument on appeal to be effective. See Atkins v. Dugger, 541 So.2d 1165, 1167 (Fla.1989). Moreover, even assuming the trial court erred in giving the instruction, we find the error was harmless under the facts in this case. Thus, appellate counsel was not ineffective for failing to raise this claim on appeal.
In addition, Carroll argues that appellate counsel was ineffective for failing to argue on appeal that the HAC instruction was unconstitutionally vague. Trial counsel did not object to the instruction on the basis it was unconstitutionally vague, but rather objected to the applicability of the instruction. Thus, this claim was not preserved for appeal. See Roberts v. Singletary, 626 So.2d 168, 168-69 (Fla.1993) (holding claim that HAC instruction was unconstitutionally vague was procedurally barred where trial counsel only objected to its applicability). Nonetheless, the record reflects that appellate counsel not only challenged the sufficiency of the evidence supporting the finding of HAC, but also argued that the instruction given was unconstitutionally vague. On appeal, we affirmed the trial court's finding of HAC. See Carroll, 636 So.2d 1316, 1319-20 (Fla. 1994). Although we did not specifically address the argument that the instruction given was unconstitutionally vague, the record reflects that the HAC instruction given in this case was virtually identical to the one that withstood scrutiny in Hall v. State, 614 So.2d 473, 478 (Fla.1993), subsequent to Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). Thus, there is no basis for relief.
Carroll also alleges that appellate counsel was ineffective for failing to argue that the penalty phase jury instructions improperly shifted the burden to him to prove that a life sentence would be appropriate. Trial counsel did not object to the instructions on the ground that they improperly shifted the burden. Therefore, this issue was not properly preserved for appeal. Furthermore, this Court has consistently held that the burden-shifting argument is without merit. See Rutherford, 774 So.2d at 644 & n. 8; Demps v. Dugger, 714 So.2d 365, 368 & n. 8 (Fla.1998). Appellate counsel's failure to raise nonmeritorious issues does not constitute ineffective assistance. See Groover, 656 So.2d at 425.
Next, Carroll asserts that the trial judge impermissibly suggested to the jury that the law required a recommendation of death, and that appellate counsel was ineffective for failing to raise this issue on appeal. We disagree. Contrary to Carroll's assertion, the trial court did not impermissibly suggest to the jury that the law required a recommendation of death. Therefore, appellate counsel was not ineffective for failing to raise this issue on appeal.
Within this issue, Carroll also argues that the jury was not properly instructed that mercy and sympathy are proper considerations during the penalty phase. This issue was not properly preserved for appeal. Appellate counsel cannot be ineffective for failing to raise issues not properly preserved for appeal. See Johnson, 695 So.2d at 266-67; Groover, 656 So.2d at 425. Moreover, this Court has previously rejected the argument that appellate counsel was ineffective for failing to argue this issue on appeal when, as in this case, the trial court gave the standard jury instructions with respect to sentencing and advised the jury that it could consider any other aspect of defendant's *624 character or record and any other circumstances of the offense as mitigation. See Correll v. Dugger, 558 So.2d 422, 425 (Fla. 1990). Accordingly, appellate counsel was not ineffective for failing to raise this issue on appeal.
Lastly, Carroll argues that Florida's capital sentencing scheme is unconstitutional. Carroll, however, does not argue that appellate counsel was ineffective for failing to raise this issue. Nonetheless, even if Carroll had alleged ineffectiveness of appellate counsel, this issue would be without merit since this Court has decided this issue adversely to Carroll's position. See, e.g., Fotopoulos v. State, 608 So.2d 784, 794 (Fla.1992).[22]

CONCLUSION
For the reasons set forth above, we affirm the trial court's denial of postconviction relief. We also deny Carroll's petition for writ of habeas corpus.
It is so ordered.
SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
WELLS, C.J., concurs in result only.
NOTES
[1] In so doing, the trial court found the following three aggravating factors: (1) Carroll was previously convicted of two felonies involving the use or threat of violence to the person; (2) the capital felony was committed while Carroll was engaged in the commission of a sexual battery; and (3) the capital felony was especially heinous, atrocious, or cruel. See id. at 1319. The trial court found no statutory mitigating circumstances, but found as a nonstatutory mitigating circumstance that Carroll suffered from "some possible mental abnormalities and has an antisocial personality." Id.
[2] These claims included: (1) Carroll is being denied his right to effective representation because CCRC lacks sufficient funds; (2) public records are being withheld; (3) ineffective assistance of counsel during the penalty phase; (4) the Florida Bar rules' prohibition against interviewing jurors is unconstitutional; (5) jury instructions on prior conviction of a violent felony aggravator, engaged in the commission of a sexual battery aggravator, avoiding lawful arrest aggravator, and heinous, atrocious, or cruel aggravator were improper; (6) ineffective assistance of counsel during the guilt phase; (7) State withheld evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (8) Florida's statute setting forth the aggravating circumstances to be considered in a capital case is facially vague and overbroad; (9) ineffectiveness of counsel denied Carroll his rights to adequate mental health assistance pursuant to Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (10) ineffective assistance of counsel to the extent counsel conceded admissibility by failing to object to the introduction of certain photographs into evidence; (11) Carroll was denied constitutional rights when the judge and prosecutor impermissibly suggested to the jury that the law required a recommendation of death; (12) the jury was misinformed of its advisory role and counsel was ineffective for failing to object; (13) the penalty phase jury instructions shifted the burden to Carroll to prove a life sentence was appropriate and counsel was ineffective in failing to object; (14) Florida's capital sentencing statute is unconstitutional; (15) the prosecutor made inflammatory and improper comments and counsel was ineffective for failing to object; (16) the sentencing court erroneously instructed the jury on the standard by which it must judge expert testimony and counsel was ineffective for failing to object; (17) the murder in course of a felony aggravator is an automatic aggravator and counsel was ineffective for failing to object; (18) the jury was misled and incorrectly informed as to its function at capital sentencing and counsel was ineffective for failing to object; (19) Carroll was incompetent during his capital pretrial, trial, and sentencing proceedings; (20) Carroll is innocent of first-degree murder and was denied an adversarial testing; (21) counsel was ineffective in failing to properly investigate and provide the mental health experts with necessary information, thereby resulting in the loss of the affirmative defense of insanity; (22) counsel failed to discover and remove prejudiced jurors; (23) newly discovered evidence shows Carroll's conviction and sentence are constitutionally unreliable; and (24) cumulative procedural and substantive errors deprived Carroll of a fair trial.
[3] Huff v. State, 622 So.2d 982 (Fla.1993).
[4] These claims included: claim 3 (ineffective counsel during penalty phase); claim 6subpart A (counsel ineffective during guilt phase because he failed to provide background materials to mental health experts), and subpart C (counsel ineffective during guilt phase for failing to investigate other suspects); claim 9 (only as to counsel's alleged ineffectiveness in connection with the mental health experts); claim 19 (only as to those claims involving counsel's alleged ineffectiveness in relation to the mental health experts); and claim 21 (only as to counsel's alleged ineffectiveness in connection with the mental health experts).
[5] These issues include: (1) the trial court erred in denying Carroll's claim that he is not guilty by reason of insanity; (2) the trial court erred in denying Carroll's claim that: (a) he was incompetent at all stages of the proceedings and trial counsel's ineffectiveness denied him a reliable competency hearing; and (b) Carroll's waiver of his right to testify and call witnesses in mitigation was not knowing, voluntary, and intelligent because he was incompetent and trial counsel was ineffective in failing to investigate mitigation; (3) the trial court erred in denying Carroll's claim that trial counsel was ineffective during the penalty phase; (4) the trial court erred in denying Carroll's claim that trial counsel was ineffective during the guilt phase; (5) Carroll was denied a full and fair evidentiary hearing; (6) the trial court erred in summarily denying: (a) Carroll's claim alleging denial of effective postconviction representation; (b) Carroll's claim alleging a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (c) claims 4, 10, 12, 13, 15, 17, and 18 in Carroll's amended 3.850 motion as being procedurally barred or without merit; (d) Carroll's claim alleging that he was deprived of his right to a competent mental health expert pursuant to Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); and (e) Carroll's claim alleging cumulative error.
[6] We find issue (1) to be an attempt by collateral counsel to relitigate the issue of Carroll's sanity at the time of the offense. This issue could have been raised on direct appeal and thus is procedurally barred. See Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995). In addition, we find issue (2)(b) is procedurally barred. This issue was not asserted in Carroll's amended 3.850 motion below and thus was not addressed by the trial court. Accordingly, this issue is not properly before this Court on appeal. See Shere v. State, 742 So.2d 215, 218 n. 7 (Fla.1999); Doyle v. State, 526 So.2d 909, 911 (Fla.1988).
[7] In issue (6)(c), Carroll alleges that the trial court erred in summarily denying claims 4, 10, 12, 13, 15, 17, and 18 in his amended 3.850 motion as being procedurally barred or without merit. On appeal, however, Carroll fails to assert any definitive argument as to this issue. Thus, we find this issue is insufficiently presented for review. See Shere v. State, 742 So.2d 215, 217 n. 6 (Fla.1999).
[8] We find that issues (5), (6)(a), and (6)(e) are without merit. In issue (5), Carroll argues that he was denied a full and fair evidentiary hearing because the trial court allegedly prevented collateral counsel from fully questioning Detective Latrelle regarding Detective Payne's investigative notes and the trial court denied collateral counsel's motion for an extension of time to submit written closing argument. Based upon our review of the record, we conclude that this issue is without merit.

Likewise, we find Carroll's allegation in issue (6)(a) that the trial court erred in summarily denying his claim that he is being denied his right to effective representation because CCRC lacks sufficient funds is without merit. This Court has held that claims of ineffective assistance of postconviction counsel do not present a valid basis for relief. See Lambrix v. State, 698 So.2d 247, 248 (Fla. 1996). Moreover, the record reflects that the trial court granted Carroll's motion for continuance requesting the court to continue the evidentiary hearing because of collateral counsel's alleged lack of funding. Although Carroll alleges that funds for hiring experts were inadequate, he does not point to any specific expert he was unable to retain as a result of under-funding. Carroll's conclusory assertion within this issue that public records were not provided to counsel or, if received, were incomplete is insufficiently pled. Moreover, the record reveals that the trial court held several hearings as to Carroll's public records requests and expressly concluded that all matters relating to his requests had been settled.
Lastly, given our resolution of the issues raised by Carroll on appeal, we find no merit to Carroll's cumulative error claim raised in issue (6)(e). See Downs v. State, 740 So.2d 506, 509 (Fla.1999).
[9] The record reveals that Dr. Erlich did not re-examine Carroll pursuant to the trial court's order, nor did he attend the competency hearing despite being subpoenaed. In his initial report evaluating Carroll in December 1990, however, Dr. Erlich concluded that Carroll was competent to stand trial and that he believed much of Carroll's mental symptomatology was self-serving distortions.
[10] Dr. Kirkland, who first examined Carroll in November of 1990, originally concluded that Carroll was incompetent to stand trial on a murder charge. Based on his re-examination of Carroll in October of 1991, however, Dr. Kirkland testified at the competency hearing that he believed Carroll was competent to proceed.
[11] By contrast, Dr. Kirkland testified for the State that he believed Carroll was not insane at the time of the offense.
[12] Dr. Gutman's initial diagnosis was as follows: malingering; psychosexual disorder, pedophilia (provisional); and mixed personality disorder with antisocial passive-aggressive, paranoid and borderline personality traits.
[13] It is worth noting that Dr. Gutman was not the only expert at trial to indicate that Carroll may have been malingering. For instance, Dr. Kirkland testified that some elements of the psychological testing performed at his request shortly after Carroll's arrest indicated that he was malingering. Although Dr. Kirkland believed Carroll's symptoms of schizophrenia were genuine, he testified that he thought Carroll's claims of amnesia concerning many important events were not accurate.
[14] Trial counsel did speak with several DNA experts in preparation for dealing with the DNA evidence and did seek to exclude the DNA evidence during trial. On appeal, this Court denied Carroll's contention that the trial court erred in denying his motions with respect to the propriety of the DNA testing, noting that defense counsel was permitted to voir dire and extensively cross-examine the State's DNA expert. See Carroll, 636 So.2d at 1319.
[15] The family members' testimony at the evidentiary hearing established that they had not maintained a close relationship with Carroll. For instance, Carroll's step-brother stated he had not seen Carroll since the 1980s; Carroll's half-sister testified she had not seen Carroll since the 1960s; Carroll's sister noted that she had not seen Carroll since 1981; Carroll's nephew stated that he had not seen Carroll since the 1970s; and Carroll's niece testified that she had not seen Carroll in at least ten years.
[16] Moreover, the State responds that the presentation of these witnesses would have allowed cross-examination and rebuttal evidence that would have likely countered any additional value Carroll might have gained from such testimony. For example, as noted by the trial court, several of Carroll's family members testified at the evidentiary hearing that they were aware of Carroll's prior sexual misconduct with children, including an incident with his own niece. See Rose, 617 So.2d at 295 ("In light of the harmful testimony that could have been adduced from Rose's brother and the minimal probative value of the cousins' testimony, we are convinced that the outcome would not have been any different had their testimony been presented at the penalty phase."); Medina v. State, 573 So.2d 293, 298 (Fla.1990) (finding no ineffectiveness in not presenting witnesses where they would have opened the door for the State to explore defendant's violent past).
[17] See Supra note 16.
[18] For example, in claim 6, subpart C, of his amended motion, Carroll stated, "Whether through the State's failure to disclose material, exculpatory information, Brady; prosecutorial misconduct, Giglio; ineffective assistance of counsel, Strickland v. Washington; or the fact that this information is newly discovered evidence, Jones v. State, 591 So.2d 911 (Fla.1991); this critical information was not investigated by defense counsel or presented to the jury." Moreover, collateral counsel during the evidentiary hearing stated, "I'm offering [the investigative notes] for the, under Brady, offering them. They existed, there was information that is exculpatory, potentially, that was out there. That's what I'm offering it for."
[19] Carroll also relies on several provisions of the Rules Regulating the Florida Bar to support his claim that he must be competent while pursuing appellate remedies. We find such reliance to be misplaced. Contrary to Carroll's assertions, these ethical rules do not support his argument that he must be competent to pursue appellate remedies.
[20] In particular, the State argued:

By your vote, tell Elmer Carroll you do not deserve to live. There is nothing good about you. There is nothing but evil in you and you must die.
A small child sometimes will cry out in the night frightened by a shadow or a piece of wallpaper that looks like a monster and its parents will come in and say it's okay, you don't have to be afraid. There's no monsters under the bed. There is no boogie man. There is no creature which stalks the night searching out children. It doesn't exist. Well, ladies and gentlemen, those parents lie because, ladies and gentlemen, that is the boogie man right there. That is the creature that stalked the night and murdered a ten year old girl and he must die.
[21] To the extent Carroll alleges that appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred in not ordering another competency hearing sua sponte, we find his claim to be without merit. See Ferguson v. Singletary, 632 So.2d 53, 58 (Fla.1994).
[22] Carroll's additional claim within this issue that he is incompetent and that requiring him to elect electrocution or lethal injection violates due process and the Eighth Amendment is premature since the appeals process is still ongoing and a death warrant has not yet been signed. See Fla. R.Crim. P. 3.811.